## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                        )

| | |
|---|---|
| RELMAN, DANE & COLFAX PLLC<br>1225 19th Street NW, Suite 600<br>Washington, D.C. 20036 | )<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | )<br>) |
| FAIR HOUSING COUNCIL OF SAN<br>FERNANDO VALLEY<br>8134 Van Nuys Boulevard, #206<br>Panorama City, CA 91402 | )<br>)<br>)<br>) |
| MEI LING<br>6750 Whitsett Avenue, #310<br>North Hollywood, CA 91606 | )<br>)<br>)<br>) |
| Defendants. | )<br>) |

Civ. No. 18-495

_____

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Relman, Dane & Colfax PLLC (the "Relman Firm"), brings this action against

Defendants the Fair Housing Council of San Fernando Valley (the "FHC") and Mei Ling ("Ms.

Ling," and together with the FHC, "Defendants"), for declaratory judgment and anticipatory

breach of contract under the laws of the District of Columbia.  The Relman Firm alleges as

follows:

## NATURE OF THE ACTION

1.　　This is a lawsuit to enforce the terms of attorney retainer agreements governed by

District of Columbia law, which the FHC and Ms. Ling have attempted—without justification—

to "void" and "terminate" in a transparent ploy to shirk their obligations to pay fees owed to the

Relman Firm.

2.      For years, the Relman Firm provided exemplary representation—on a contingent-fee basis—to the FHC and Ms. Ling in connection with a lawsuit it filed under the False Claims Act, 31 U.S.C. § 3729, *et seq.*  In that False Claims Act lawsuit, the FHC and Ms. Ling serve as relators, alleging that the City of Los Angeles and a related defendant submitted false claims to the United States government in order to receive hundreds of millions of dollars of federal housing and community development funds.  Under the False Claims Act, relators are entitled to receive between 15 and 30 percent of any amounts recovered through settlement or judgment.

3.      When the Relman Firm agreed in 2010 to represent the FHC and Ms. Ling in the False Claims Act litigation, the parties entered into fee agreements—governed by District of Columbia law—under which the FHC and Ms. Ling agreed to pay the Relman Firm at least one-third of any monetary award they recovered.

4.      Despite the risk of its contingent fee agreement, the Relman Firm set out to vigorously investigate and prosecute the False Claims Act case on behalf of the FHC and Ms. Ling.

5.      Between February 2011, when the False Claims Act lawsuit was filed, and May 30, 2017, when the government filed its election to intervene, the Relman Firm continued to develop the evidence and legal theories necessary to establish liability.  Throughout that time, while the matter remained under seal and the government was weighing whether to decline or intervene, the Relman Firm was required to proceed on two parallel paths: doing everything possible to secure the government's intervention in this matter, and simultaneously preparing to litigate this matter on its own if the government declined the case, which occurs in more than 75 percent of False Claims Act lawsuits brought by private relators.

6.      The government's decision to intervene reflects, in significant part, the extensive factual and legal development by the Relman Firm.  It also is highly probative of a False Claims Act lawsuit's success on the merits, given that more than 90% of cases in which the government intervenes end in a settlement or judgment in favor of the government.

7.      When news of the government's decision became public, one of Ms. Ling's representatives called the government's decision a "monumental" result for Ms. Ling.

8.      Simply put, the government's decision to intervene would not have been possible without years of work from the Relman Firm.

9.      Despite the "monumental" result achieved by the Relman Firm, the FHC and Ms. Ling have announced they have no intention of honoring the fee agreements they entered into more than seven years ago.  Ms. Ling claimed in an August 2017 court filing that "the Relman Firm . . . forfeited any fee to which it may have been entitled by breaching its fiduciary duty to Ms. Ling."  The FHC's new counsel announced that the FHC "has opted to void" its agreement with the Relman Firm, which is not permitted under applicable District of Columbia law.

10.      Having benefited from the Relman Firm's extraordinary work over the course of more than six years, the FHC and Ms. Ling now seek to deprive the Relman Firm of its contractually-negotiated fee—without any basis for doing so.  The Relman Firm did not breach any duty owed to Ms. Ling (or anyone else), and the FHC has no right to "void" its agreement.

11.      In this lawsuit, the Relman Firm asks this Court to declare (a) that the FHC's and Ms. Ling's payment obligations under the retainer agreements with the Relman Firm remain in full force and effect; and (b) that the FHC and Ms. Ling have anticipatorily breached the retainer agreements.

12.     This matter is ripe for judicial review: The FHC and Ms. Ling have each declared

their intention to deprive the Relman Firm of the attorney's fees to which it is entitled.

## PARTIES

13.     Plaintiff Relman, Dane & Colfax PLLC is a professional limited liability

company incorporated under the laws of the District of Columbia, and headquartered at 1225

19th Street NW, Suite 600, Washington, D.C. 20036.

14.     Defendant Fair Housing Council of San Fernando Valley is incorporated under

the laws of the State of California with its principal place of business in Panorama City,

California.

15.     Defendant Mei Ling is a natural person and a resident of Los Angeles, California.

## JURISDICTION & VENUE

16.     This Court has jurisdiction over this claim pursuant to 28 U.S.C. § 1332.  At all

relevant times, the parties were of diverse citizenship, and the amount in controversy exceeds

$75,000.

17.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because

Plaintiff has its principal place of business in this district and a substantial part of the events or

omissions giving rise to the claim occurred in this district.

18.     This Court has personal jurisdiction over Defendants pursuant to D.C. Code § 13-

423(a)(1), as the claims arise from business the Defendants transacted in the District of

Columbia.  In particular, the FHC and Ms. Ling each: sought out and retained the Relman Firm,

a District of Columbia law firm with unique capabilities and experience at the intersection of

False Claims Act and disability rights litigation; agreed to retainer agreements governed by

District of Columbia law; understood that most of the work on the False Claims Act lawsuit was

4

to be performed in the District of Columbia; and directed communications regarding the False

Claims Act lawsuit into the District of Columbia for more than six years.

19.     Defendants held out the Relman Firm—District of Columbia-based attorneys—as

their counsel for more than six years in court filings, communications with the government, and

otherwise.  Defendants initially retained the Relman Firm by signing retainer agreements

governed by District of Columbia law.  And, in fact, the legal services performed by the Relman

Firm took place in the District of Columbia.  Defendants' communications purporting to

"terminate" and "void" the retainer agreements were knowingly directed into the District of

Columbia.  It was foreseeable that the injuries resulting from Defendants' breaches of the

retainer agreements—the deprivation of significant attorneys' fees and reputational harm—

would occur in the District of Columbia because the Relman Firm is based in the District of

Columbia, with 18 of its 20 attorneys working in the District.

## FACTUAL BACKGROUND

20.     The Relman Firm is a civil rights law firm based in Washington, D.C.  The

Relman Firm litigates civil rights cases in the areas of housing, lending, employment, public

accommodations, education, and police accountability.

21.     The Relman Firm pioneered private relators' use of the False Claims Act, 31

U.S.C. § 3729 *et seq.*, to ensure that cities and other municipal entities comply with their

obligations under federal civil rights laws.  Nearly a decade ago, the Relman Firm persuaded the

court in *United States ex rel. Anti-Discrimination Center of Metro New York v. Westchester

County* to hold that when a municipality accepts federal funds, the False Claims Act imposes an

affirmative obligation to ensure those funds are used to make housing opportunities available in a

manner consistent with federal fair housing laws.  *See* 495 F. Supp. 2d 375 (S.D.N.Y. 2007)

(denying motion to dismiss); 668 F. Supp. 2d 548 (S.D.N.Y. 2009) (granting plaintiff's motion for summary judgment).

   **A.    The FHC and Mei Ling Seek Out and Engage the Relman Firm.**

   22.    In 2010, after learning of the Relman Firm's success in the *Westchester* matter, the FHC and Ms. Ling sought out the Relman Firm to develop and prosecute a case against the City of Los Angeles ("Los Angeles") and the Community Redevelopment Agency of the City of Los Angeles (the "Community Redevelopment Agency") based on alleged violations of the False Claims Act (the "False Claims Act case"; 11-cv-00974 (C.D. Cal.)).

   23.    On December 8, 2010, the FHC and Ms. Ling retained the Relman Firm by each signing a retainer agreement (together, the "Agreements") that set forth both parties' "mutual understanding with respect to the provision of legal services and the bases upon which [the Relman Firm's] fees and related expenses will be charged and paid." The Agreements are identical in all material respects, including the terms of payment to the Relman Firm.

   24.    The Agreements were signed on behalf of the Relman Firm by Michael Allen, one of its partners. Mr. Allen is a prominent District of Columbia attorney, who led and directed the False Claims Act case efforts from the District of Columbia.

   25.    The Relman Firm's principal place of business is in this District, and it is incorporated here as well. Of its 20 attorneys, 18 are based in the District of Columbia, one is based in Ohio, and another in New Mexico.

   26.    The Agreements set forth the "reasonable attorneys' fees" to which the Relman Firm is entitled in the event the FHC or Ms. Ling obtain a monetary award in the False Claims Act case.

   27.    In general terms, if the FHC or Ms. Ling receives a "lump sum settlement or offer of judgment" or prevails at summary judgment or trial, the FHC and Ms. Ling agreed to pay the

Relman Firm the Firm's lodestar fees or one-third (33 1/3%) of their monetary award, whichever is greater.

28.     The FHC and Ms. Ling also agreed that the Agreements "shall be governed in accordance with the laws of the District of Columbia[.]"

**B.     The Relman Firm Diligently and Skillfully Represents the FHC and Mei Ling.**

29.     The Relman Firm began its representation of the FHC and Ms. Ling by conducting an extensive investigation of Los Angeles's and the Community Redevelopment Agency's failures to comply with the federal architectural and program accessibility requirements of Section 504 of the Rehabilitation Act and the Fair Housing Act ("FHA"), and their repeated false certifications to the U.S. Department of Housing and Urban Development ("HUD")—based in the District of Columbia—that they had complied with those requirements.

30.     The Relman Firm's initial investigation was memorialized in a January 28, 2011 "disclosure statement" to the U.S. Department of Justice ("DOJ") in Washington, D.C.  That statement consisted of a 17-page narrative and 46 exhibits, which detailed the manner in which the defendants had violated the False Claims Act by failing to ensure the accessibility of federally-assisted apartment complexes.  It was that disclosure statement that first notified the government of the false claims, and put the government on the trail of the fraud alleged in the government's Complaint-in-Intervention in the False Claims Act lawsuit.

31.     The Relman Firm subsequently filed the False Claims Act case on behalf of the FHC and Ms. Ling, alleging that Los Angeles and the Community Redevelopment Agency submitted false statements and false claims to the United States government in order to receive Community Development Block Grant, HOME Investment Partnership Program, and other housing and community development funds and payments from the United States.

32.     Although the False Claims Act case remained under seal for more than six years, the Relman Firm consulted regularly with counsel for the government on factual issues in the case and continuously provided the government with additional evidence—developed by the Relman Firm—that Los Angeles and the Community Redevelopment Agency had violated their certifications of compliance with the Section 504 and FHA accessibility requirements, which were preconditions to their eligibility to receive federal funds.

33.     By September 2016, the Relman Firm had given DOJ more than 200 architectural site surveys, plan reviews, and measurement reviews.  The Relman Firm also provided expert reports and transcripts of depositions of more than a dozen Los Angeles and Community Redevelopment Agency officials responsible for ensuring compliance with the federal requirements or with making certifications to HUD.  Finally, the Relman Firm regularly shared with DOJ its findings about which properties (i) had received federal funding from Los Angeles and/or the Community Redevelopment Agency for new construction after the Section 504 and FHA accessibility requirements took effect, and (ii) may be subject to those requirements on the basis of having been substantially rehabilitated with such funds.

34.     The Relman Firm also provided DOJ with its analysis concerning the applicable False Claims Act legal standards and their application to the facts developed by the Relman Firm or by DOJ.

35.     Crucially, the Relman Firm identified, analyzed, and highlighted evidence that Los Angeles and the Community Redevelopment Agency knowingly violated the False Claims Act.  The Relman Firm compiled and provided materials from the Community Redevelopment Agency's Disability Task Force proceedings.  These materials demonstrated that the problems with accessibility were well-known as early as 2007 or 2008, yet neither Los Angeles nor the

Community Redevelopment Agency addressed those problems in existing buildings or in buildings in the development pipeline.  The Relman Firm also shared with DOJ all of the relevant HUD regulations and guidance documents, highlighting those provisions that had been brought to Los Angeles's and the Community Redevelopment Agency's attention by HUD and others.  It also provided to DOJ copies of relevant audits by HUD's Office of Inspector General and the Los Angeles City Controller.

36.     Much of the evidence shared with the government came from a separate lawsuit filed by the Relman Firm on behalf of the FHC and two other organizations, which alleged that Los Angeles and the Community Redevelopment Agency violated Section 504 of the Rehabilitation Act and the Fair Housing Act (the "Section 504 action").  *See Independent Living Center of Southern California, et al. v. City of Los Angeles, et al.*, No. 2:12-cv-551 (C.D. Cal.).

37.     The Agreements do not govern the Relman Firm's representation of the FHC in the Section 504 action.  Rather, that engagement was governed by a separate fee agreement.  Although the Relman Firm received a statutory fee award in the Section 504 case, that statutory fee award was separate from the fees to which the Relman Firm is entitled in the False Claims Act case under the terms of the Agreements.

**C.     The Relman Firm Persuades the United States to Intervene in the False Claims Act Case.**

38.     In May 2017, more than six years after the Relman Firm began working on the False Claims Act case, the United States announced its intention to intervene in that lawsuit.  In so doing, the HUD Inspector General specifically praised "the important role whistleblowers play in the process of uncovering waste, fraud, and abuse," and explained that this case "displays our commitment to fully pursue allegations that are brought to our attention."

39.     The evidence and legal theories developed by the Relman Firm were crucial to

DOJ's Complaint-in-Intervention.  For example, evidence developed by the Relman Firm

assisted the government in alleging, "Before 2012, the City did not appoint a Section 504/ADA

coordinator to coordinate the City's efforts to comply with Section 504 and the ADA with

respect to housing."  False Claims Act case, Complaint-in-Intervention, ¶ 197.  The Relman Firm

also secured proof, through depositions of key witnesses, that "[a]t least up until May 2014, the

City—including its departments, agencies, and housing authorities acting on its behalf—did not

monitor or enforce the federal accessibility laws before issuing permits, during inspections, and

for purposes of code enforcement."  False Claims Act case, Complaint-in-Intervention, ¶ 187.

Moreover, based in part on the Relman Firm's lengthy voluntary disclosure to DOJ, the

government alleged, "On numerous occasions, members of the public told the CRA/LA that its

properties did not comply with the federal accessibility laws."  False Claims Act case,

Complaint-in-Intervention, ¶ 300.

40.     Government intervention in the False Claims Act case represented a major victory

for the FHC and Ms. Ling, and it greatly increased their chances of recovery.  According to the

Department of Justice, "Fewer than 25% of filed qui tam actions result in an intervention on any

count by the Department of Justice."  Department of Justice, *False Claims Act Cases:

Government Intervention in Qui Tam (Whistleblower) Suits*.  The Relman Firm overcame these

long odds through its persistence and quality legal work over many years, with its only path to

compensation being recovery of fees under the retainer agreements with the FHC and Ms. Ling.

41.     Securing the government's intervention also meant that the job of the Relman

Firm—or any other relator's counsel—was nearly complete.  In a False Claims Act suit, once the

government has intervened and taken over the litigation, the ongoing role of relator's counsel is

minimal.  *See* Boese, John T., *Civil False Claims and Qui Tam Actions*, § 4.05 The Department of Justice's Role, ("[I]f the government elects to intervene, Sections 3730(b) and (c) clearly provide that the government controls the action."); *id.* (describing relator's role following government intervention as "limited").  In other words, virtually all of the work of relator's counsel in the False Claims Act case had been done by the Relman Firm.

42.     The government would not have intervened in the False Claims Act case without the Relman Firm's tireless advocacy on behalf of Ms. Ling, the FHC, and disabled residents of Los Angeles.

43.     The government's intervention in False Claims Act case also means that the FHC and Ms. Ling are all but certain to recover a significant monetary award—and the Relman Firm is contractually entitled to one-third of their recovery.  Indeed, the government's success rate when it intervenes in *qui tam* cases is more than 90%.[1]

44.     Court filings in the FCA case indicate that the government is seeking damages (after trebling) exceeding $2 billion.[2]  The False Claims Act provides that when the government recovers in an intervened case, the relator(s) are entitled to "at least 15 percent but not more than 25 percent of the proceeds of the action or the settlement of the claim[.]"  31 U.S.C. § 3730(d)(1).  The Relman Firm is contractually entitled to one-third of any such recovery.

---

[1]     *See, e.g.*, David Freeman Engstrom, *Public Regulation of Private Enforcement: Empirical Analysis of DOJ Oversight of Qui Tam Litigation under the False Claims Act*, 107 Nw. U. L. Rev. 1689, 1720 (2013).

[2]     *See* Defendant City of Los Angeles's Memorandum in Support of Motion to Dismiss, FCA case Dkt. No. 128-1, at 11.

**D.      Notwithstanding the Relman Firm's Successful and Effective Representation, Defendants Announce Their Intention to Breach Their Payment Obligations.**

45.     In December 2016, lawyers from the U.S. Department of Justice—one in the District of Columbia and one in Los Angeles—contacted the Relman Firm seeking a conference call to "provide you with an update on the status of the settlement discussions and to discuss relator's share."

46.     Shortly thereafter, in correspondence directed to both the Relman Firm and government counsel in the District of Columbia, both the FHC and Ms. Ling promptly terminated the Relman Firm as counsel.

47.     Sharon Kinlaw, the FHC's Executive Director, terminated the Relman Firm by e-mail dated December 18, 2016, and copied government counsel in the District of Columbia.  In doing so, she inflicted reputational harm on the Relman Firm by alleging, without any basis in fact, that the Relman Firm had engaged in unethical conduct, and "disqualified itself from the False Claims Act case."

48.     Similarly, when she fired the Relman Firm on the eve of her expected monetary recovery, Ms. Ling purported to terminate "any contingency agreement with Relman, Dane & Colfax."

49.     Many months later, Ms. Ling claimed that her termination of the Relman Firm was based on frivolous allegations of breach of fiduciary duty.  Ms. Ling's accusations have no basis in law or fact, and are a transparent attempt to deprive the Relman Firm of its fee.

50.     The FHC's position on honoring its fee obligation remained unclear for several months.  Then, after a court filing indicated that a partial settlement of the False Claims Act lawsuit may be imminent, the FHC's new counsel informed the Relman Firm's counsel (in the District of Columbia) that the FHC "has opted to void [the FHC's Agreement]."

51.     At the time the FHC and Ms. Ling terminated the Relman Firm, the Relman Firm

stood ready to continue providing excellent legal counsel on behalf of the FHC and Ms. Ling—

either by persuading the government to intervene, or by litigating the case through trial (if

necessary) if the government elected not to intervene.

52.     Upon information and belief, the FHC and Ms. Ling have conspired to deprive the

Relman Firm of the fees to which it is entitled under the Agreements.  For example, Ms. Ling's

frivolous breach of fiduciary duty allegation relies upon a confidential email containing legal

advice sent from the Relman Firm to the FHC.  Ms. Ling was not copied on this email, yet she

was given this email by the FHC.  When Ms. Ling filed this email in federal court, it was

accompanied by a declaration from the FHC's Executive Director, Ms. Kinlaw, waiving the

attorney-client privilege as to that document.

53.     The FHC and Ms. Ling are estopped from attempting to terminate the

Agreements.  The FHC and Ms. Ling benefited from the Relman Firm's excellent representation

for more than six years.  During this time, neither the FHC nor Ms. Ling attempted to "void" or

"terminate" the Agreements.  Only when the prospect of a settlement—and a monetary award—

appeared imminent did the FHC and Ms. Ling reverse course and declare their intention to

breach the Agreements—with no legally plausible basis—in a transparent ploy to shirk their

obligation to honor a years-old promise to pay the Relman Firm a share of their recovery.

## COUNT I - DECLARATORY JUDGMENT
## (AGAINST BOTH DEFENDANTS)

54.     The Relman Firm incorporates each of the foregoing paragraphs of this Complaint

by reference into this paragraph.

55.     There is a genuine and bona fide dispute and an actual controversy and

disagreement between the Relman Firm and Defendants regarding Defendants' obligations under

the Agreements to pay the Relman Firm its legal fees earned during its representation of

Defendants in the False Claims Act case.

56.     The Agreements are valid and enforceable contracts between the Relman Firm

and the FHC and between the Relman Firm and Ms. Ling.

57.     The Relman Firm has fully performed or tendered all performance required under

the Agreements.

58.     Each Agreement stated: "This Retainer Agreement shall be governed in

accordance with the laws of the District of Columbia without regard to the conflict of laws

provisions thereof."

59.     Notwithstanding this unambiguous understanding that the Agreement shall be

governed by District of Columbia law, the FHC announced on October 23, 2017 that it has

"opted to void" the Agreement in a manner not permitted by District of Columbia law.

60.     Similarly, Ms. Ling has sought to terminate her Agreement with the Relman Firm,

without valid justification.

61.     A legally cognizable controversy exists between the Relman Firm on the one

hand, and each of the FHC and Ms. Ling on the other hand, regarding whether the FHC and Ms.

Ling are obligated to fulfill the fee obligations set forth in the Agreements.

62.     The Relman Firm therefore seeks a declaration that the FHC and Ms. Ling are not

entitled to "void" or "terminate" the Agreements, and that instead they are obligated to comply

with the Agreements.

63.     Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202,

the Relman Firm in good faith requests that the Court declare that the Agreements remain in full

force and effect and that the FHC and Ms. Ling are obliged to comply with them.

## COUNT II  - ANTICIPATORY BREACH OF CONTRACT
## (AGAINST BOTH DEFENDANTS)

64.     The Relman Firm incorporates each of the foregoing paragraphs of this Complaint by reference into this paragraph.

65.     The Agreements are valid and enforceable contracts between the Relman Firm and the FHC and between the Relman Firm and Ms. Ling.

66.     The Relman Firm has fully performed or tendered all performance required under the Agreements.

67.     The FHC and Ms. Ling have anticipatorily breached the Agreements by unequivocally repudiating, without basis, their obligations to pay the Relman Firm the legal fees due under those contracts.

68.     As a direct and proximate cause of Defendants' acts, the Relman Firm has suffered and will continue to suffer general and consequential damages of at least one-third (33 1/3%) of the FHC's and Ms. Ling's monetary recovery in the False Claims Act case.

## PRAYER FOR RELIEF

WHEREFORE, the Relman Firm respectfully requests that this Court enter a judgment in its favor and award the following relief:

a.     Declare that the FHC and Ms. Ling are obligated to fulfill the fee obligations set forth in the Agreements;

b.     Declare that Defendants have anticipatorily breached the Agreements by purporting to "void" and "terminate" the Agreements without proper legal basis;

c.     After entering judgment in the Relman Firm's favor, retain jurisdiction over this matter as necessary to enforce the declaratory and other relief awarded to the Relman Firm; and

15

      d.     Grant the Relman Firm such other and further relief as the Court may deem just and proper.

## JURY DEMAND

The Relman Firm demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

March 1, 2018

Respectfully submitted,

*/s/ Benjamin J. Razi*
Benjamin J. Razi (D.C. Bar No. 475946)
Andrew Soukup (D.C. Bar No. 995101)
Andrew Leff (D.C. Bar No. 1044770)
Covington & Burling LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001
(202) 662-6000
brazi@cov.com
asoukup@cov.com
aleff@cov.com

ATTORNEYS FOR PLAINTIFF RELMAN, DANE & COLFAX PLLC