## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RELMAN, DANE & COLFAX PLLC,<br><br>                    Plaintiff,<br><br>          v.<br><br>FAIR HOUSING COUNCIL OF SAN FERNANDO VALLEY; MEI LING,<br><br>                    Defendants. | Civil Action No. 1:18-cv-00495-TNM |

## DECLARATION OF MEI LING IN SUPPORT OF DEFENDANT MEI LING'S MOTION TO DISMISS OR TRANSFER

I, Mei Ling, declare:

1.      I am a defendant in this case.  I have personal knowledge of the facts stated herein, and I could and would competently testify to those facts if called as a witness.  I make this declaration in support of my Motion to Dismiss for Lack of Subject Matter Jurisdiction, Lack of Personal Jurisdiction and Improper Venue, or in the Alternative, to Transfer the Case to the Central District of California.

2.      I am a resident of the State of California.

3.      I have never owned any real property in the District of Columbia.  I have never operated a business in the District of Columbia.  I have never held investments located in the District of Columbia.  I have never maintained any bank accounts in the District of Columbia.  I have never been licensed by any agency of the District of Columbia.  I have never applied for a license issued by the District of Columbia.  I have never traveled to the District of Columbia.  I have never derived income from goods used or consumed or services rendered in the District of Columbia.  I have never incurred any tangible personal property tax liabilities in the District of Columbia.

4.      Since 2006, I have sought but been unable to secure accessible and

affordable housing in Los Angeles because of my disabilities.

5.     In 2010, I attended the annual Fair Housing Laws and Litigation Conference in San Diego ("2010 Fair Housing Conference"), with the intention of meeting with John Travina, the then United States Department of Housing and Urban Development ("HUD") Assistant Secretary for Fair Housing and Equal Opportunity, regarding a HUD fair housing complaint that I had filed.  I also intended to meet with Steven Rosenbaum, Chief of the Housing and Civil Enforcement Section of the Civil Rights Division of the U.S. Department of Justice, relating to on-going disability discrimination and accessible-housing violations that I had experienced in the City of Los Angeles ("City") and its then Community Redevelopment Agency of Los Angeles ("CRA-LA").

6.     At no time did I have any expectation of attending this conference to meet Michael Allen or anyone from his firm Relman, Dane, Colfax ("RDC") to take on my case.  In fact, two years earlier in February 2008, I spoke with Scott Chang, at that 2008 Fair Housing Laws and Litigation Conference.  While at that conference I spoke with Mr. Chang about my HUD fair housing complaints and my greater concerns with disability discrimination in Los Angeles.  Scott Chang said he would talk to his colleagues at RDC about my concerns.  However, he never contacted me after that conference.

7.     While at the 2010 Fair Housing Conference I attended the presentation of the keynote speaker, Craig Gurian, who is an attorney from the Anti-Discrimination Center in New York.  After the session, I was speaking with Mr. Gurian when Michael Allen of RDC interrupted and asked how I knew there was no accessible housing in Los Angeles.  Mr. Allen then asked if he could talk to me about our experiences in Los Angeles, but I informed him that I attended the conference to see the next session during which Mr. Rosenbaum and Scott Moore were speaking on fair housing accessibility laws and enforcement.  I agreed to speak with Mr. Allen after that session. I had not previously met or spoken to attorney Allen.

8.      During Mr. Moore's presentation, I learned that he was formally a Senior Trial Attorney in the DOJ Civil Rights Division and appreciated his knowledge and delivery about enforcing Section 504 provisions, and related obligations by housing providers and municipalities receiving federal funds.  I approached Mr. Moore after his session and we discussed Los Angeles' systemic accessibility failures.  Mr. Moore and I then headed to the conference luncheon, where he introduced me to his law partner Allison Balus.

9.      After the luncheon, Mr. Allen again approached me and asked if he could speak with me, Sharon Kinlaw, and another person with a disability who I was assisting because he too was experiencing disability discrimination in Los Angeles.  During that conversation, I shared with him my experiences, and he requested that I send him any documents and evidence I had supporting the allegations of disability discrimination.

10.     When speaking with Mr. Moore after his session, I asked him if I could send him documents and other evidence supporting my disability discrimination claims so he would be able to evaluate whether he could represent me.  Mr. Moore, having seen me speaking with Mr. Allen, informed me that he wanted to speak with Mr. Allen as a professional courtesy before consenting to represent me.  Mr. Moore subsequently informed me that he reached out to Mr. Allen to discuss the matter, but Mr. Allen failed to respond.

11.     In the weeks following the 2010 Fair Housing Conference, Allen contacted me on multiple occasions requesting various documents and urging me to retain him to represent me.  In persuading me to retain him, Mr. Allen boasted about his recent settlement in a fair housing accessibility case that resulted in grant funds to retrofit units.  At his request, I provided Mr. Allen the documents regarding the lack of accessible housing and disability discrimination that I and others were experiencing in Los Angeles.

12.     Over the course of the next several months, Mr. Allen persisted in his solicitation efforts that consisted of telephone calls and requests for further

documentation and information that I had collected pertaining to Los Angeles' accessibility violations and Los Angeles' Budgets and Certifications submitted by the City to obtain HUD grant fund draw downs.

13.     In September 2010, Mr. Allen informed Sharon Kinlaw of the Fair Housing Council ("FHC") and me that he had a draft of a federal False Claims Act ("FCA") complaint that he wanted us to review for filing in the United States District Court for the Central District of California.  I informed Mr. Allen that I had never been a party to this type of action, and I was reluctant to agree to accede to his request to pursue litigation on my behalf when he stated there was no remedy available in the FCA case for accessible housing units for me and others in dire need of affordable accessible housing placements.  In response, Mr. Allen insisted I would have a strong FCA case and that RDC wanted to serve as my lawyers.

14.     Mr. Allen stated he wanted FHC and me to be "co-Relators" and asked me what attorney I knew in Los Angeles who may be willing to serve as local counsel because he was not admitted in California.  Mr. Allen emphasized he only wanted to be able to "use" someone's name, but that attorney would not actually do any work on the case.  Mr. Allen rejected attorneys whom Ms. Kinlaw and I recommended, including stating that he would have "alpha" issues with one California attorney we recommended who had experience handling Section 504, FHA, and disability discrimination cases.

15.     On December 6, 2010, Mr. Allen sent me a retainer agreement for the FCA case.  Mr. Allen inserted a choice-of-law provision in the contract, as well as a page-long section relating to attorney's fees.  Neither Mr. Allen nor I attempted to negotiate the retainer agreement, and I did not travel to the District of Columbia to discuss the retainer agreement or any aspect of the FCA case.

16.     Notwithstanding my inexperience with litigation, neither Mr. Allen nor any other attorney from RDC ever discussed or explained these terms, or advised me to seek the counsel of an outside attorney.  RDC did not explain how any recovery by the

FHC and me would be apportioned, and RDC did not explain if or how any responsibility for fees and costs would be divided as between the FHC and me.

17.     I understood that RDC would recoup no fees or costs if I did not obtain relief.  However, if the FHC and I received a monetary award by settlement or judgment, I understood that RDC would then submit its hourly fees to the court for approval; a separate payment to RDC would then be made directly by the City of Los Angeles. Furthermore, I understood that under limited and highly unlikely circumstances, RDC's entitlement to attorney fees would shift from recovery of the firm's hourly rate to a percentage of my monetary relief.   Based on RDC's representations, I signed the retainer agreement.   A true and correct copy of the retainer agreement is attached hereto as **Exhibit 1**.

18.     RDC filed the FCA case on my behalf in 2011.  I am informed and believe that the defendants in the FCA case have filed a motion to dismiss.  However, no defendant has filed an answer, no discovery has been served by any party, no scheduling order has been issued; no trial date has been set, preliminary settlement discussions have stalled, and no motions for summary judgment have been filed.  No portion of the FCA case has been litigated in federal court in the District of Columbia.

19.     RDC also represented me in an individual case filed against the City of Los Angeles and CRA-LA because I was unable to secure housing because of a lack of accessibility required by the FHA and Section 504.  Mr. Allen attempted to coerce me into signing a settlement agreement to resolve that case that included dismissal of my individual case as well as any FCA claims against Los Angeles and the CRA-LA.  Mr. Allen stated he did not have time to work on my individual case because he had to devote more time to bigger issues and the "504" case.   After I refused to sign the settlement agreement, RDC withdrew from representing me without substitution of counsel, leaving only local counsel to handle the matter.  The case was then dismissed by summary judgment.  That case was also filed in the U.S. District Court for the Central

District of California and all proceedings, personal contact, discovery and other matters were conducted within the Central District of California.  All in-person interactions that I have had with any person from RDC have occurred in California.  All materials that I sent to RDC were forwarded at RDC's request and direction.  I never requested or directed RDC to conduct any work outside of California.

20.     Frustrated with RDC's lack of zealous representation, I again contacted Mr. Moore and requested he represent me in connection with the FCA case and assist me in my appeal to the Ninth Circuit of the dismissal of my individual case.

21.     In or about September 2012, Mr. Moore and his law firm agreed to represent me in both cases.  While I believed Mr. Moore should substitute RDC in the FCA case, Mr. Moore recommended that I not terminate RDC to ensure my interests were fully protected because they had represented me thus far.

22.     I understood that RDC filed in the Central District of California a separate Fair Housing and Civil Rights Section 504 action (the "Section 504 case") on behalf of the FHC and two other non-profit organizations.  I understood that by mid-May 2016, the parties to the Section 504 case had reached a preliminary settlement, the finalization of which was dependent upon approval by the Los Angeles City Council.  In December 2016, the FHC shared with me an email received from RDC, in which RDC recommended that FHC agree to a reduction in any future settlement of FCA case based on the value of retrofits the City would be funding pursuant to the settlement of the separate Section 504 case.  A true and correct copy of RDC's email is attached hereto as **Exhibit 2**.  I was never informed of, never consented to, and would never have approved such a recommendation.  It was and is my understanding and belief that RDC made this recommendation in effort to encourage the FHC to grant final approval of the then-pending Section 504 settlement.

23.     Upon learning of RDC's direct attempts to undermine the value of my FCA litigation and failing to represent my interests in my individual case and the FCA case, I

terminated RDC's representation of me in the FCA case.  Mr. Moore has continued to represent me in the FCA case.  RDC's breach of loyalty and fidelity to me and to my case was the primary motivating factor for my termination of RDC's representation.

24.    In September 2017, RDC through California counsel filed a notice of appearance and lien for attorney's fees against me in my FCA case.  The lien asserts the same claim to fees that RDC is pursuing against me in this case in the District of Columbia.

25.    Following my termination of RDC's representation in the FCA case, I informed RDC that I was exercising my right under California Business & Professions Code section 6147 to void the retainer agreement.  Among the bases for this election were RDC's failure to explain how the costs of litigation would be apportioned between the FHC and me, as well as RDC's failure to explain to me how any recovery would be apportioned between the FHC and me.  A true and correct copy of the April 30, 2018 letter sent on my behalf to RDC's attorneys is attached hereto as **Exhibit 3**.

26.    I am a wheelchair user, in poor physical health, unable to secure employment because of my disability, and have extremely limited financial means. Travel to the District of Columbia to defend this lawsuit will be physically and financially onerous.

27.    I am aware of no witnesses, other that RDC's own attorneys, who have knowledge pertinent to the allegations of the Complaint.  I am a resident of Los Angeles County, and I am informed and believe that the FHC is located in a suburb of Los Angeles.  I am further informed and believe that at least one of RDC's former attorneys, Scott Chang, is a California attorney and resident; Chang made appearances in one or both of the FCA and/or Section 504 cases in Los Angeles federal court.  I am further informed and believe that RDC's attorney Jamie L. Crook, who appeared in the FCA case, has been a member of the California bar since 2006.  I am further informed and believe that Mitchell Kamin is a California attorney representing RDC with respect to

RDC's lien filed in the FCA case.

I declare under penalty of perjury that the foregoing is true and correct.  Executed June 26, 2018, in Los Angeles, California

s/ Mei Ling
Mei Ling, Declarant



# 17th Annual
## Fair Housing Laws & Litigation Conference

*February 11th -12th, 2010*
San Diego City Concourse
202 C Street
San Diego, CA 92101

The Fair Housing Council of San Diego • The John Marshall Fair Housing Legal Support Center
The Fair Housing Council of San Fernando Valley • California Rural Legal Assistance, Inc.

Present

## Research, Rights and Enforcement – Legislative Remedies
### *Connecting the Dots with Fair Housing Markers*

## AGENDA

**OFFERING 12 CLE CREDITS**

| | |
|---|---|
| **Thursday, February 11** | |

**7:45 AM - 8:15 AM** — **General Conference Registration**

**8:20 AM - 8:55 AM** — **Welcome and Introductions**

Opening Speaker
Plenary Session — **Craig Gurian, Esq.,** Executive Director, Anti-Discrimination Center, will discuss the False Claims Act case brought by the Center in response to Westchester County's fraudulent certifications that it had 'affirmatively furthered fair housing', highlighting the historic desegregation remedies that have been ordered, and providing a frank first report on the barriers to successful implementation.

Introduction — **Nadine Cohen, Esq.,** Greater Boston Legal Services

**9:00 AM -10:30 AM** — **Scattering the Seeds of Westchester**

For many years, the obligation to 'affirmatively further fair housing' (AFFH) lay dormant, and HUD did not challenge the AFFH certifications of cities and counties that received CDBG and other federal funds. As a result, contrary to the intention of Congress, billions of federal dollars have been spent and segregated housing patterns have persisted throughout the nation.  The Westchester decision has begun to change all that and HUD says it will publish a new AFFH regulation in the winter of 2009-2010. This session will focus on developments since Westchester, and suggest how participants can use AFFH in their own communities to dismantle segregation and expand housing choice.

Speakers — **Chris Brancart, Esq.,** Brancart and Brancart; **Michael Allen, Esq.,** Relman & Dane, PLLC

Moderator — **Craig Gurian, Esq.,** Anti Discrimination Center

**10:45 AM -12:15 PM
Disability** — **An Overview of the Protections for Persons with Disabilities under the Fair Housing Act, Section 504 of the Rehabilitation Act/ Others and Related Enforcement Resources**

 A U. S. Department of Housing and Urban Development study has identified ways in which discrimination is perpetrated against persons with disabilities, including persons with mental disabilities. Learn the specific requirements for public, private and special needs housing providers and properties built with federal financial assistance such as HOME, CDBG as well as for architects, builders and developers who are responsible for accessible housing units under applicable law.

Speakers — **Steven Rosenbaum, Esq.,** U. S. Department of Justice; **Katherine Knister,** Silver State Fair Housing Council**; Scott P. Moore, Esq.,** Baird Holm, LLP

Moderator — **David Quezada,** U. S. Department of Housing and Urban Development, Los Angeles

DOCS/2097208.1