# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| RELMAN, DANE & COLFAX PLLC, | ) |
|  | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) Civil Action No. 18-00495 (TNM/RMM) |
|  | ) |
| FAIR HOUSING COUNCIL OF SAN FERNANDO VALLEY et al., | ) |
|  | ) |
|  | ) |
| Defendants. | ) |

## REPORT AND RECOMMENDATION

This case arises from a contract dispute between Relman, Dane & Colfax PLLC (the "Relman Firm" or "Relman"), a civil rights law firm located in Washington D.C. ("D.C." or "the District"), and its former clients, Defendant Fair Housing Council of San Fernando Valley ("FHC") and Defendant Mei Ling ("Ms. Ling," and together with FHC, "Defendants"). The Relman Firm contends that Defendants terminated and voided the contracts pursuant to which they had retained the Relman Firm as counsel in a matter pending in a federal district court in California, thereby reneging on their contractual obligation to pay the Relman Firm a contingency fee equaling a percentage of Defendants' recovery. *See generally* Compl., ECF No. 1. The Relman Firm contends that Defendants' actions constitute an anticipatory breach of their respective contracts, and seeks a declaratory judgment and other relief. *See id.* at 15[1] (prayer for relief).

---

[1] Page citations refer to ECF header pagination, as opposed to the document's original pagination.

Defendants each separately filed Motions to Dismiss, which are pending before the

Court.[2] *See* Mot. to Dismiss ("FHC MTD"), ECF No. 10; Mot. to Dismiss ("Ling MTD"), ECF

No. 22. Both Defendants contend that this Court lacks subject matter jurisdiction because the

claim is unripe for review. *See* FHC MTD at 23–32; Ling MTD 15–18. Defendants also both

assert that they lacked sufficient contacts with D.C. for this Court to assert personal jurisdiction

over them. *See* FHC MTD at 32–41, Ling MTD at 18–24. Defendants alternatively assert that

venue is improper, and ask the Court to transfer the case to a proper venue in the Central District

of California (CACD), where both Defendants reside, abstain from hearing the Declaratory

Judgment Act claims, or stay the case. *See* FHC MTD at 29–32, 41–49; Ling MTD at 24–30.

Ms. Ling also seeks dismissal under Rule 12(b)(6) for failure to state a claim, asserting that the

Relman Firm failed to assert cognizable damages for its anticipatory breach claim. *See* Ling

MTD at 30–32.

## BACKGROUND

### I.     FACTUAL BACKGROUND

#### A.     Initial Meeting and Retention

Plaintiff Relman Firm is a civil rights law firm based in Washington D.C. with a practice

group dedicated to litigating fair housing matters. *See* Compl. ¶ 20. Defendant FHC is a three-

employee non-profit that operates in Panorama City, CA and investigates housing discrimination

---

[2] The following documents are also pertinent to the pending motion; Pl.'s Opp'n to Def.'s Mot. to Dismiss. ("Pl.'s Opp'n to FHC"), ECF No. 14; Def.'s Reply to Opp'n to Def's Mot. to Dismiss, ECF No. 15 ("FHC Reply"); Pl.'s Opp'n to Def.'s Cross Mot. ("Pl.'s Opp'n to Ling"), ECF No. 26; Def.'s Reply to Pl.'s Opp'n to Def.'s Mot. to Dismiss ("Ling Reply"), ECF No. 27; Pl.'s Surreply to Def.'s Mot. to Dismiss ("Pl.'s Surreply"), ECF No. 30; Pl.'s Not. Supp. Auth., ECF No. 31; Def. FHC's Resp. Supp. Auth., ECF No. 32.

complaints and finds fair housing solutions for disabled and low-income individuals in the Los Angeles area. *See* Kinlaw Decl. ("Kinlaw 1st Decl."). ¶ 2, ECF No. 10-2.

On February 11, 2010, Michael Allen, a Relman partner based in Washington D.C., travelled to an annual Fair Housing Laws and Litigation Conference ("2010 Fair Housing Conference") in San Diego, CA to make a presentation about a successful False Claims Act ("FCA") matter that the Relman Firm had initiated. *See* Allen Decl. ("Allen 1st Decl.") ¶ 6, ECF No. 14-1. Defendant FHC's Executive Director, Sharon Kinlaw, was one of the principal organizers of the conference. *See id.* During the conference, Mr. Allen met Ms. Kinlaw and Ms. Ling and discussed potential fair housing and disability rights violations and the nature of the Relman Firm's work. *See id.* ¶ 9. The parties dispute who solicited whom at the conference. For several months after the conference, the parties communicated through telephone, email, and mail regarding investigations into potential violations of fair housing law by Los Angeles and its Community Redevelopment Agency. *See* Kinlaw 1st Decl. ¶¶ 8–10; Allen 1st Decl. ¶ 15.

Eventually, via mail and telephone, the parties discussed forming an attorney-client relationship to litigate a FCA lawsuit. *See* Allen 1st Decl. ¶¶ 19–21, Kinlaw Decl. 10. On December 8, 2010, FHC and Ms. Ling retained the Relman Firm by signing separate, but identical retainer agreements (collectively, the "Agreements"). *See* Compl. ¶ 23. The Relman Firm mailed the Agreements to the parties, and neither FHC nor Ms. Ling traveled to the District to execute the Agreements. *See* Allen 1st Decl. ¶¶ 21, 25–26; Kinlaw 1st Decl. ¶ 13; Ling Decl. ¶ 15.

The Agreements state that the Relman Firm "is entitled to its reasonable attorney's fees" and certain costs, "[i]n the event relief is obtained." FHC Retainer Agreement 2, ECF 10-3; Ling Retainer Agreement at 2. If the litigation is resolved by settlement or an offer of judgment that

does not separately address the provision of fees, the Agreements entitle the Relman Firm to one-third of a monetary award, or its actual fees and costs, whichever is greater. *See id.* If the litigation is resolved by a summary judgment ruling or a trial at which FHC or Ms. Ling prevails, the Relman Firm is entitled to one-third of the monetary award, plus costs, or the court's award of fees and costs, whichever is greater. *See id.* If FHC or Ms. Ling does not prevail in the litigation, the clients are not responsible for the Relman Firm's fees, and are responsible only for costs. *See id.* The Agreements define reimbursable costs to include "duplicating costs, telephone charges, postage, travel, computer research, filing fees, deposition costs, and the like." *See id.* at 3.

**B.      The Relman Firm's Representation of FHC and Ms. Ling**

Upon being hired, the Relman Firm investigated the City of Los Angeles's and a California agency's alleged failure to comply with Section 504 of the Rehabilitation Act and the Fair Housing Act. *See* Compl. ¶ 29. The Relman Firm memorialized its investigation in a disclosure statement to the U.S. Department of Justice on January 28, 2011. *See id.* ¶ 30. Subsequently, the Relman Firm filed a FCA suit ("the FCA Litigation") on behalf of the Defendants on February 1, 2011 in the CACD. *Id.* ¶ 31. Four Relman attorneys — two of whom were not barred in Washington D.C. — represented the Defendants and entered their appearances in the FCA Litigation. *See* FHC MTD at 11 n.1, 13; *id.*, Ex. 3 (ECF Docket, Case No. 11-cv-00974 (CACD) ("FCA CACD Docket"). The case remained under seal for more than six years, but the Relman Firm regularly consulted with government counsel regarding legal analysis and factual evidence including architectural site surveys, expert reports, and deposition transcripts. *See* Compl. ¶¶ 32–33. During that six-year period, the Relman Firm developed the

evidence and legal theories to support the claims against Los Angeles and the California agency and prepared to litigate the matter if DOJ declined to intervene in the case. *See id.* ¶ 5.

### C.      FHC's and Ms. Ling's Termination of the Relman Firm

On December 18, 2016, Ms. Kinlaw terminated the Relman Firm as counsel for FHC in the FCA Litigation via email and accused the Relman Firm of unethical conduct. *See* Compl. ¶ 35; Pl.'s Opp'n to FHC, Ex. E (FHC Termination Email), ECF No. 14-6. Later, FHC's lawyers emailed the Relman Firm's lawyers to void FHC's Agreement with the Relman Firm. *See* Compl. ¶ 36; Pl.'s Opp'n to FHC, Ex. F (FHC Void Letter), ECF No. 14-7.

Ms. Ling also terminated the Relman Firm via email and subsequently mailed a letter to void the Agreement. *See id.*, Ex. D (Dec. 19, 2016 Email from Mei Ling), ECF No. 14-5; *id.*, Ex. G (April 30, 2018 Letter from Mei Ling's Counsel "Voiding" Contract), ECF No. 14-8. Ms. Ling contended that her termination of the relationship with the Relman Firm terminated "any contingency agreement with Relman, Dane and Colfax." Compl. ¶ 48. In a filing in the FCA Litigation, Ms. Ling asserted that the Relman Firm had "forfeited any fee to which it may have been entitled by breaching its fiduciary duty to Ms. Ling." *Id.* ¶ 9.

### D.      The Government's Intervention in the FCA Litigation

In May 2017, the federal government intervened in the FCA Litigation. *See id.* ¶¶ 38–39. The Relman Firm contends that the evidence it uncovered factored into the government's decision to intervene. *See id.* ¶¶ 39–41. Once the government intervened and took control over the litigation, little work remained for the Relman Firm to perform. *See id.* ¶ 41 (citing Boese, John T., *The Department of Justice's Role, in* <u>Civil False Claims and Qui Tam Actions</u> § 4.05). In the FCA Litigation, the government seeks damages exceeding $2 billion, and the relators

(FHC and Ms. Ling) would be entitled to 15–25% of the proceeds in the action. *See* Compl. ¶ 44 (citing 31 U.S.C. § 3730(d)(1)).

## II. PROCEDURAL HISTORY

The Relman Firm filed its Complaint in this Court on March 1, 2018. *See id*. The complaint seeks to enforce the Agreements. *See id.* ¶ 1. Specifically, the Relman Firm alleges that Defendants' repudiation of their relationship with the Relman Firm while the FCA Litigation remained pending constituted an anticipatory breach of the Agreements, thereby depriving the firm of the legal fees due under the Agreements' contingency fee arrangement. *See id.* ¶¶ 67–68. The complaint seeks a declaratory judgment that Defendants have anticipatorily breached their contract with the Relman Firm and that Defendants' "payment obligations under the retainer agreements with the Relman Firm remain in full force and effect." *Id.* ¶ 11.

FHC filed a Motion to Dismiss on April 10, 2018. *See* FHC MTD. On May 9, 2018, District Judge Trevor N. McFadden referred this matter to Magistrate Judge Robin M. Meriweather for full case management up to but excluding trial. *See* 05/09/2018 Min. Order. Subsequently, Ms. Ling filed a Motion to Dismiss on June 26, 2018. *See* Ling MTD.

On June 20, 2018, FHC filed a notice related to a jurisdictional challenge to "mandatory fee arbitration proceedings" between FHC and the Relman Firm before the Los Angeles Bar Association Dispute Resolution Services, Inc. Fee Arbitration Program. *See* Notice of Related Ruling, ECF No. 21. The arbitrator's June 8, 2018 ruling overruled the Relman Firm's jurisdictional challenges, finding that the arbitration program had jurisdiction to hear the matter. *See id.,* Ex. A (Ruling by Los Angeles Co. Bar Ass'n) 4–7, ECF No. 21-1.

The FCA Litigation continues to be litigated in the Central District of California. *See generally* Docket, *United States v. City of Los Angeles*, Case No. 2:11-cv-00974-PSG-JC

(CACD). On July 25, 2019, the Relman Firm filed a supplemental notice advising the Court that the City of Los Angeles had unsuccessfully moved to dismiss the Government's amended complaint, and that the Community Redevelopment Agency of the City of Los Angeles ("CRACLA"), a defendant in the FCA Litigation, had reached an agreement to settle with the Government which was being finalized. *See* Pl.'s Not. Supp. Auth. at 2; *United States v. City of Los Angeles*, No. 2:11-cv-00974, 2019 WL 3213581, *3–4 (C.D. Cal. July 15, 2019). In response, FHC advised the Court that Ms. Ling did not join the settlement with CRACLA and has challenged the proposed settlement. *See* Def. FHC's Resp. Supp. Auth. ¶ 4.

## LEGAL STANDARD

### A. Subject Matter Jurisdiction — Rule 12(b)(1)

Courts review challenges to the ripeness of a case under Federal Rule of Civil Procedure 12(b)(1), which requires courts to dismiss claims over which they lack subject-matter jurisdiction. *See Sierra Club v. U.S. Dep't of Energy*, 825 F. Supp. 2d 142, 154 (D.D.C. 2011); *see also* FED. R. CIV. P. 12(b)(1). The party invoking federal jurisdiction bears the burden of establishing by a preponderance of the evidence that the court has subject matter jurisdiction. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561 (1992). "Because Rule 12(b)(1) concerns a court's ability to hear a particular claim, the court must scrutinize the plaintiff's allegations more closely . . . than it would under a motion to dismiss pursuant to Rule 12(b)(6)." *Barry Farm Tenants v. D.C. Housing Auth.,* 311 F. Supp. 3d 57, 63 (D.D.C. 2018). The Court may resolve a Rule 12(b)(1) motion based on the complaint, or, "where necessary, the court may consider the complaint supplemented by the undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Coalition for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir 2003); *see also Herbert v. Nat'l*

*Acad. of Sciences,* 974 F.2d 192, 197 (D.C .Cir. 1992) (noting that district courts may consider materials outside the pleadings when reviewing motions to dismiss for lack of jurisdiction). The Court must nonetheless "treat the complaint's factual allegations as true . . . and must grant plaintiff[s] the benefit of all inferences that can be derived from the facts alleged." *Sparrow v. United Air Lines, Inc.,* 216 F.3d 1111, 1113 (D.C. Cir. 2000) (internal citations omitted); *see also Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

### B.     Personal Jurisdiction — Rule 12(b)(2)

Rule 12(b)(2) "authorizes a motion to dismiss based upon the traditional defense that the court lacks jurisdiction over the defendant's person, which raises a question as to whether the controversy or defendant has sufficient contact with the forum to give the court the right to exercise judicial power over defendant." *Wiggins v. Equifax Inc.,* 853 F. Supp. 500, 501 (D.D.C. 1994) (citation omitted); *see also* FED. R. CIV. P. 12(b)(2).

The plaintiff bears the burden of establishing personal jurisdiction over each defendant "by the preponderance of the evidence." *Shapiro, Lifschitz & Schram, P.C. v. Hazard,* 90 F. Supp. 2d 15, 20 (D.D.C. 2000); *see also Crane v. N.Y. Zoological Soc'y,* 894 F.2d 454, 455–56 (D.C. Cir. 1990). The plaintiff "must allege specific acts connecting the defendant with the forum." *Thompson Hine LLP v. Smoking Everywhere Inc.*, 840 F. Supp. 2d 138, 141 (D.D.C. 2012) (citing *Second Amendment Found. v. U.S. Conference of Mayors,* 274 F.3d 521, 524 (D.C. Cir. 2001)). When reviewing a 12(b)(2) motion, the court may consider materials outside of the pleadings, including declarations and evidence produced during jurisdictional discovery. *See Frost v. Catholic Univ. of Am.,* 960 F. Supp. 2d 226, 231 (D.D.C. 2013); *see also Artis v. Greenspan,* 223 F. Supp. 2d 149, 152 (D.D.C. 2002). Factual discrepancies should be resolved in favor of the plaintiff. *See Crane,* 894 F.2d at 455–56. However, the Court need not treat all

of the plaintiff's jurisdictional allegations as true. *See United States v. Philip Morris Inc.,* 116 F. Supp. 2d 116, 120 n. 4 (D.D.C. 2000). "Instead, the court may receive and weigh affidavits and any other relevant matter to assist it in determining the jurisdictional facts." *In re Papst Licensing,* 590 F. Supp. 2d at 98 (internal quotation marks and citation omitted).

### C. Failure to State A Claim — Rule 12(b)(6)

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a plaintiff's complaint." *Herron v. Fannie Mae*, 861 F.3d 160, 173 (D.C. Cir. 2017); *see also Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). To survive such a motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also* FED. R. CIV. P. 8(a)(2). A complaint states a facially plausible claim if the facts alleged "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "[L]abels and conclusions," or "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

When reviewing a Rule 12(b)(6) motion, "the complaint is construed liberally in plaintiff's favor, and the Court should grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" *Redding v. District of Columbia*, 828 F. Supp. 2d 272, 278 (D.D.C. 2011) (quoting *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994)). The Court does not, however, accept "inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint." *Browning*, 292 F.3d at 242 (quoting *Kowal*, 16 F.3d at 1275); *see also Redding*, 828 F. Supp. 2d at 278. Further, the presumption of truth accorded to the complaint applies only to factual allegations, not legal conclusions. *See Iqbal*,

566 U.S. at 678 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."); *see also Harris v. D.C. Water and Sewer Auth.*, 791 F.3d 65, 68 (D.C. Cir. 2015) (quoting *Iqbal*, 566 U.S. at 678). As part of its review, the Court may consider documents attached to the complaint and "matters of which we may take judicial notice." *Parks v. Giant of Md., LLC*, 295 F. Supp. 3d 5, 8 (D.D.C. 2018) (quoting *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997)).

## DISCUSSION

Both defendants contend that the complaint should be dismissed for lack of subject matter and personal jurisdiction. Defendants' challenge to the Court's subject matter jurisdiction concerns the ripeness of Relman's claims. *See* FHC MTD at 23–32; Ling MTD 15–18. Defendants base their challenge to the Court's personal jurisdiction on their assertion that they lack sufficient contact with the District to be subject to suit in this Court. *See* FHC MTD at 32–41; Ling MTD at 18–24. As an alternative to dismissing the action for lack of subject matter jurisdiction, Defendants ask the Court to abstain from hearing, stay, or transfer the case to the Central District of California (CACD), where both Defendants reside. *See* FHC MTD at 29–32, 41–49; Ling MTD at 24–30. Ms. Ling also seeks dismissal under Rule 12(b)(6) for failure to state a claim, asserting that Relman failed to assert cognizable damages for its anticipatory breach claim. *See* Ling MTD at 30–32. The Court will analyze each argument in turn below.

## I. THE RELMAN FIRM'S CLAIMS ARE RIPE FOR ADJUDICATION

Defendants contend that the Court should dismiss the complaint for lack of subject matter jurisdiction because the Relman Firm's claims are unripe. *See* FHC MTD at 14–20; Ling MTD 15–18. Defendants admit that they terminated their respective Agreements with the Relman Firm, but state that this suit is premature because the fees are contingent upon future events that

have not occurred and may never occur, and thus the Relman Firm is not currently entitled to recover any fees or costs under the Agreements. *See* FHC MTD at 15–19; Ling MTD at 9–10, 17. The Relman Firm counters that its claims are ripe because Defendants have unequivocally expressed their intent to repudiate the Agreements, and that the parties' dispute regarding the enforceability of the Agreements presents a live and justiciable controversy. *See* Pl.'s Opp'n to FHC at 16–19; Pl.'s Opp'n to Ling at 16–19. In a supplemental filing, the Relman Firm further asserts that a pending settlement between FHC and one defendant in the FCA Litigation confirms the ripeness and non-speculative nature of the claims the Relman Firm has raised here. *See* Pl.'s Supp. Auth. at 1–2.

"Ripeness is a justiciability doctrine . . . drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction . . ." *Nat'l Park Hospitality Ass'n v. Dep't of the Interior,* 538 U.S. 803, 807–08 (2003) (internal citations and quotation marks omitted). The constitutional component of ripeness requires that the party seeking judicial review demonstrate that there is "an injury in fact [that is] certainly impending." *Perry Capital LLC v. Mnuchin,* 864 F.3d 591, 632 (D.C. Cir. 2017). Thus, a claim is "not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States,* 523 U.S. 296, 300 (1998) (citations omitted). "The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests . . . It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 240–241 (1937). In essence, "if a plaintiff's claim . . . depends on future events that may never come to pass, or that may not occur in the form forecasted, then the claim

is unripe." *Devia v. Nuclear Regulatory Comm'n,* 492 F.3d 421, 425 (D.C. Cir. 2007). The prudential aspect of ripeness requires courts to evaluate "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Perry Capital LLC*, 864 F.3d at 632; *accord Kaufman v. Nielsen*, 896 F.3d 475, 483 (D.C. Cir. 2018); *Conservation Force v. Jewell*, 733 F.3d 1200 (D.C. Cir. 2013).

The fact that the Relman Firm seeks relief under an anticipatory breach of contract theory affects the application of the ripeness doctrine to this case. "[I]f a performing party unequivocally signifies its intent to breach a contract, the other party may seek damages immediately under the doctrine of anticipatory repudiation." *Jankins v. TDC Management Corp.,* 21 F.3d 436, 443 (D.C. Cir. 1994). Essentially, "anticipatory breach is 'a doctrine of accelerated ripeness' because 'it gives the plaintiff the option to have the law treat the promise to breach [or the act rendering performance impossible] as a breach itself." *Perry Capital,* 864 F.3d at 632–33 (D.C. Cir. 2017) (citing *Homeland Training Ctr., LLC v. Summit Point Auto. Research Ctr.*, 594 F.3d 285, 294 (4th Cir. 2010) (citing *Franconia Assocs. v. U.S.*, 536 U.S. 129, 143 (2002)). *See generally New York State Teamsters Conf. Pension & Retirement Fund*, 591 F.2d 953, 957 (D.C. Cir. 1979) ("Under traditional doctrine, repudiation constitutes a breach of contract even though made in advance of the time performance is due."). Thus, an anticipatory breach claim becomes prudentially ripe "immediately upon repudiation." *Perry Capital*, 864 F.3d at 633.

Defendants' motions ignore the accelerated ripeness of anticipatory breach claims, mistakenly presuming that the Relman Firm's claims would only ripen when fees are due, *i.e.* at the conclusion of the FCA Litigation if Defendants prevail and obtain monetary relief. To the contrary, the fact that the FCA Litigation remains pending, and no attorney's fees or costs are yet

due, does not render the Relman Firm's anticipatory breach of contract claim unripe. Defendants' repudiation of the Agreement is the alleged breach, thereby providing the requisite tangible injury-in-fact. *See Perry Capital*, 864 F.3d at 632–33.

FHC incorrectly asserts that the Relman Firm has abandoned its anticipatory breach claim and that the Court must therefore evaluate ripeness solely by reference to the Relman Firm's request for declaratory relief in Count I of the complaint, which seeks relief under the Declaratory Judgment Act. *See* FHC MTD at 28–29. Although the Relman Firm focuses on its claims for declaratory relief in its response to FHC's ripeness arguments, the complaint expressly raises an anticipatory breach of contract claim and alleges that FHC and Ms. Ling have repudiated the Agreement. *See* Compl. ¶¶ 66–68. The Relman Firm invokes those claims in its opposition to the motion to dismiss, and thus cannot be said to have abandoned that theory of relief. *See* Pl.'s Opp'n to FHC at 17–19; Opp'n to Ling at 22–23.

The parties' dispute about the continued enforceability of the Agreements, and the effect of Defendants' alleged repudiation of the Agreements, presents a live controversy for the court to resolve. The Relman Firm asserts that it "has fully performed or tendered all performance required under the Agreements, and [Defendants] have unequivocally repudiated, without basis, their obligations to pay the Relman Firm . . . [which will and has caused the Relman Firm to] suffer general and consequential damages . . ." Compl. ¶¶ 66–68. Defendants disagree. FHC admits that it terminated its contract with the Relman Firm, *see* FHC MTD at 12, but asserts that the Relman Firm's alleged misconduct voided the entire Agreement. *See* FHC MTD 17–18. Ms. Ling also accuses the Relman Firm of misconduct and contends that the Relman Firm has suffered no damages and thus has no viable claim because the Agreement can only be enforced once a contingency fee could be collected (*i.e.*, if Ms. Ling prevails and recovers a monetary

award in the California litigation). *See* Ling MTD at 16–17, 30–31. If the pending settlement between FHC and CRCLAC is implemented, the parties likely will dispute whether the Relman Firm is entitled to receive a portion of the settlement as compensation for its prior representation of FHC. *See* Pl.'s Not. Supp. Auth. at 1–2. These disagreements present legal disputes regarding whether FHC and Ms. Ling improperly breached their contracts or were justified, whether the contract was voided, when the Relman Firm's entitlement to fees arises and whether the entitlement to fees survives the termination of the Agreements. Thus, there is a live controversy regarding the enforceability of the Agreements that requires judicial interpretation and application of contract law.

Defendants appear to merge their merits defense into the ripeness arguments, suggesting that the Court lacks jurisdiction because the Relman Firm has no viable anticipatory breach claim as the conditions that would trigger payment of the contingent fee have not yet arisen and Relman has not yet suffered damages. *See* FHC MTD at 28–29; Ling MTD at 16–17, 30–31. However, the 12(b)(1) jurisdictional analysis does not turn on the merits of the Plaintiff's allegations. *See Best v. Kelly,* 39 F. 3d 328, 331 (D.C. Cir. 1994) ("Dismissals under Rule 12(b)(1) are not adjudications on the merits, dismissals under 12(b)(6) are.") (citing FED. R. CIV. P. 41(b)); *see Perry*, 864 F.3d at 633 (noting that the Court's "holding that the claims are ripe sheds no light on the merit of those claims"). The question for jurisdictional purposes is whether the Relman Firm has alleged claims that may be heard in federal court, not whether those claims are legally and factually sound. *See id.*

FHC also contends that the purported lack of any ripe or live case or controversy deprives the Court of subject matter jurisdiction to review the request for declaratory relief that the Relman Firm has raised in Count I of the Complaint. *See* FHC MTD at 19–20; Compl. ¶ 63

(seeking declaration under the Declaratory Judgment Act that the Agreements remain in effect and Defendants must comply with them).  The Declaratory Judgment Act authorizes federal courts to "declare the rights and other legal relations of any interested party seeking such declaration," 28 U.S.C. § 2201(a), but it "is not an independent source of federal subject matter jurisdiction," *Schilling v. Rogers,* 363 U.S. 666, 677 (1960).  Claims must still "present an actual controversy in order to justify judicial involvement." *RDP Techs., Inc. v. Cambi AS,* 800 F. Supp. 2d 127, 136 (D.D.C. 2011).  "Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune, Inc. v. Genentech, Inc.,* 549 U.S. 118, 127 (2007) (quoting *Maryland Casualty Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273 (1941).

Here, because the Relman Firm raises a separate claim for anticipatory repudiation that presents a live case and controversy, the Court may adjudicate the separate declaratory judgment claim. *See Wilton v. Seven Falls Co.,* 515 U.S. 277, 282 (1995) ("[D]istrict courts possess discretion in determining whether and when to entertain an action . . . when the suit otherwise satisfies subject matter prerequisites."); *see also MedImmune*, 549 U.S. at 136 (noting that pursuant to 28 U.S.C. § 2201(a),  a court "may" declare the rights and other legal relations of any interested party, but the act does not dictate that a court *"must"* do so).

In sum, the parties have presented true legal disputes regarding the applicability of the anticipatory breach doctrine, and the undersigned recommends that the Court find that this case is ripe for adjudication.

## II.    THE COURT HAS PERSONAL JURISDICTION OVER FHC AND MS. LING

Defendants assert that the Court lacks personal jurisdiction over them because their contacts with the District in connection with their contracts with the Relman Firm are too attenuated to subject Defendants to suit in this Court.  *See* FHC MTD at 23–31; Ling MTD at 18–26.  Ms. Ling is a resident of California.  *See* Ling Decl. ¶ 2.  FHC is a non-profit enterprise whose sole office is in Los Angeles, California.  *See* Kinlaw 1st Decl. ¶ 2.

"To establish personal jurisdiction over a non-resident, a court must . . . first examine whether jurisdiction is applicable under the state's long-arm statute and then determine whether a finding of jurisdiction satisfies the constitutional requirements of due process."  *GTE New Media Services, Inc. v. BellSouth Corp.,* 199 F.3d 1343, 1347 (D.C. Cir. 2000).  The District's long-arm statute permits courts located in the District to exercise personal jurisdiction over any individual who "transact[s] any business in the District of Columbia."  D.C. Code § 13–423(a)(1).  To base personal jurisdiction on the transaction of business under Section 13–423(a)(1), a plaintiff must show that: (1) the defendant transacted business in the District; (2) the claim arose from the business transacted in the District; and (3) the defendant had minimum contacts with the District such that the court's exercise of personal jurisdiction would not offend "traditional notions of fair play and substantial justice."  *Schwartz v. CDI Japan, Ltd.,* 938 F. Supp. 1, 4 (D.D.C. 1996) (citation omitted).  Section 13–423(a)(1) "provide[s] jurisdiction to the full extent allowed by the Due Process Clause."  *Thompson Hine*, 734 F.3d at 1189; *see also Alkanani v. Aegis Defense Services,* 976 F. Supp. 2d 13, 21–22 (D.D.C. 2014) (noting that the Due Process Clause presents no additional hurdle for a plaintiff who can demonstrate that the defendant meets the "transacting business" test of D.C. Code § 13–423(a)(1).  Thus, the Court "need only engage in a single analysis of the defendant's contacts with the District under the standards established in the long-

arm and service statutes because sufficient contacts under the D.C. Code and proper service is all that Due Process requires." *Alkanani*, (citing *Gorman v. Ameritrade Holding Corp.,* 293 F.3d 506, 513 (D.C. Cir. 2002)); *Shoppers Food Warehouse v. Moreno,* 746 A.2d 320, 329–30 (D.C. 2000)); *see also Thompson Hine*, 734 F.3d at 1189 (noting that analysis under the Due Process Clause and Section 13-423 "merge into a single inquiry").

As noted above, there must be "minimum contacts," between the defendant and the forum "such that he should reasonably anticipate being haled into court there," *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297 (1980); *see also Thompson Hine*, 734 F.3d at 1189. That analysis turns on whether "the defendant purposefully avail[ed] [him]self of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson,* 357 U.S. 235, 253 (1958). The minimum contacts requirement ensures that "random, fortuitous, or attenuated contacts" with a forum do not result in defendants being haled into court in that jurisdiction. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475 (1985) (citing *World-Wide Volkswagen,* 444 U.S. at 299).

When evaluating whether a plaintiff has proven that a defendant had minimum contacts with a forum, courts analyze "the quality and nature of the defendant's activity" in the forum. *Burger King*, 471 U.S. at 475. The defendant's contacts with the forum must arise "from actions by the defendant himself that create a substantial connection with the forum State." *Walden v. Fiore,* 571 U.S. 277, 284 (2014) (citing *Burger King Corp.,* 471 U.S. at 475). "Thus, where the defendant deliberately has engaged in significant activities within a State or has created continuing obligations between himself and residents of the forum, he manifestly has availed himself of the privilege of conducting business there" such that "it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well." *Burger*

*King*, 471 U.S. at 475–76 (internal citations omitted); *Thompson Hine*, 734 F.3d at 1190. This is not a "mechanical test," and instead is "a 'highly realistic' approach that examines 'prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing.'" *Thompson Hine*, 734 F.3d at 1190 (citing *Burger King*, 471 U.S. at 479). Courts conducting that inquiry have considered several factors, including: whether the defendant voluntarily reached into the forum to solicit business with a local firm; whether the defendant communicated or met with the plaintiff in the forum; whether the parties' agreement included a choice-of-law provision invoking the law of the forum; the length of the engagement between the parties; whether the defendant contemplated or was aware that the work to be performed would be performed in the forum; whether the defendant derived economic benefit from the employment of the plaintiff; and whether the harm caused by the defendant (such as a failure to pay) is felt in the forum. *See Koteen v. Bermuda Cablevision, Ltd.*, 913 F.2d 973, 975 (D.C. Cir. 1990) (concluding that company "purposefully established significant contacts with the District" by retaining a DC-based law firm, visiting the firm's DC office, and communicating extensively with the firm by telephone and mail); *Thompson Hine*, 840 F. Supp. 2d at 142–43 (listing factors considered in other cases and citing corresponding precedent); *Xenophon Strategies, Inc. v. Jernigan Copeland & Anderson, PLLC*, No. 15–1774, 2016 WL 1367734, at *4–5 (D.D.C. Apr. 6, 2016) (emphasizing defendant's communications with D.C. firm, selection of that firm based on specific expertise in D.C.-related issues, and the inclusion of a D.C. choice of law provision in the contract when concluding that personal jurisdiction existed).

The Relman Firm contends that Defendants transacted business in D.C. and had sufficient contacts with D.C. to be subject to suit here, given Defendants' retention of and communications with the Relman Firm (which is a D.C. firm), the terms of the Agreements, and the fact that the

Relman attorneys who worked on the case performed nearly all of their work in D.C. *See* Pl.'s Opp'n to FHC at 22–26; Pl.'s Opp'n to Ling at 24–31. Defendants disagree and emphasize that they met Mr. Allen at a California conference and hired him to perform work in California in connection with litigation pending in a California federal court. *See* FHC MTD at 24–26; Ling MTD at 11–12. Each party has submitted affidavits describing the nature and extent of their relationship and the relevant facts. The undersigned will now review that evidence to determine whether the Relman Firm has carried its burden to demonstrate, by a preponderance of the evidence, that Defendants had sufficient contacts with D.C. to confer personal jurisdiction upon this Court. *See generally In re Papst Licensing,* 590 F. Supp. 2d at 98 ("[T]he court may receive and weigh affidavits and any other relevant matter to assist it in determining the jurisdictional facts.") (internal quotation marks and citation omitted).

## A. Evidence Regarding Personal Jurisdiction

### 1. *Declarations of Michael Allen*

The Relman Firm has submitted two Declarations from Michael Allen, the Relman Firm attorney that represented FHC and Ms. Ling in the FCA Litigation. *See generally* Allen 1st Decl., Pl.'s Opp'n to Ling, Decl of Michael Allen, ECF No. 26-1 ("Allen 2d Decl."). Mr. Allen works in the Relman Firm's principal office, in Washington D.C., along with eighteen of the firm's twenty-two attorneys. *See* Allen 1st Decl. ¶ 2. Mr. Allen's declaration describes the origin and nature of the agreements between FHC, Ms. Ling, and the Relman Firm, the communications between the parties during that relationship, and the location where Relman attorneys performed work on the FCA Litigation. *See generally id.*

Mr. Allen contends that "the FHC (and Ms. Ling) approached the Relman Firm for help obtaining systemic relief, not the other way around." Allen 1st Decl. ¶ 18. Specifically, during

the question-and-answer portion of his presentation at a California conference regarding the FCA and litigating fair housing laws, "someone from a group consisting of Ms. Ling, Ms. Kinlaw, and two others . . . asked" Mr. Allen whether the same principles would apply to a particular case in Los Angeles. *See id.* ¶ 8. After the presentation, Ms. Kinlaw and her group "approached [Mr. Allen] to talk about the Relman's firm work and whether the False Claims Act theory that the Relman Firm pioneered might be useful to them." *See id.* ¶ 9. Further, they represented that the "problems were systemic," and "they had been unable to find an attorney in Los Angeles willing to take on this systemic problem." *See id.* Due to time constraints, Mr. Allen handed them a business card with his address and "welcome[d]" them to send any documents and continue discussions once he arrived back in his Washington D.C. office. *See id.*

Within ten days of his return to Washington D.C., Mr. Allen received an email from Ms. Ling, which indicated that she was writing both on her own behalf and on behalf of Ms. Kinlaw of the FHC. *See id.* ¶ 12; Pl.'s Opp'n, Ex. A (Ling 1st Email to Mr. Allen), ECF No. 14-2. In that email, Ms. Ling attached documents, asked what additional documents might be helpful, and requested a "determination if this disability discrimination issue is one that we can work together on." *See id.*

Mr. Allen references multiple communications between the Relman Firm and both FHC and Ms. Ling, including termination emails, subsequent emails to "void" the agreement, and mediation efforts, nearly all of which he received while he was in Washington D.C. *See* Allen 2nd Decl. ¶¶ 35–41. Mr. Allen communicated and received multiple documents via mail and hundreds of emails from both Ms. Ling and Ms. Kinlaw. Specifically, Ms. Ling sent Mr. Allen 78 emails from February 2010 through September 2010, prior to signing the Agreement. *See* Allen 2d Decl. ¶ 17. Ms. Ling sent an additional 198 emails between October 2010 and

December 2017.  *Id.*  Mr. Allen also spoke and emailed frequently with Ms. Kinlaw, and received "more than 100 emails about the False Claims Act case" from Ms. Kinlaw.  Allen 2d Decl. ¶ 35; Allen 1st Decl. ¶ 14.

Mr. Allen also drafted the Agreements on firm letterhead with the Relman Firm's D.C. address and asserts that he invited both the FHC and Ms. Ling to discuss the proposed agreements.  *See* Allen 1st Decl. ¶¶ 19–24.  The Agreements explicitly state that they will be "governed in accordance with the laws of the District of Columbia" and are "negotiable between the attorney and client."  *See id.* ¶¶ 19–24.  However, neither FHC or Ms. Ling proposed any questions or negotiations, and they both signed and returned their separate Agreement to the D.C. firm.  *See id.* ¶ 26.

Mr. Allen estimates that the Relman Firm performed ninety-five percent of its work on the Defendants' FCA Litigation in D.C., including work done by the case's lead attorneys, paralegals, and support staff.  *See id.* ¶ 30.  From his office in D.C., Mr. Allen conducted factual and legal research, drafted disclosure statements, and communicated with Ms. Kinlaw and Ms. Ling.  *See* Allen 1st Decl. ¶¶ 13–17.

### 2.  *Declarations of Sharon Kinlaw*

Defendant FHC has submitted two declarations from Sharon Kinlaw.  Ms. Kinlaw is the current Executive Director of the FHC, a non-profit based in the suburbs of Los Angeles, CA.  *See generally* Kinlaw 1st Decl.; Kinlaw Decl. in Support of Reply re MTD ("Kinlaw 2d Decl.").  Ms. Kinlaw's declarations describe FHC's initial encounters with Mr. Allen, its retention of the Relman Firm, and its communications with the Relman Firm.

Ms. Kinlaw suggests that the Relman Firm initiated the relationship with FHC, after speaking with FHC representatives at the annual Laws and Litigation Conference in San Diego,

CA, in February 2010.  According to Ms. Kinlaw, the Relman Firm has regularly sent firm representatives to that conference including in February 2010 when attorneys John Relman, Reed Colfax, Michael Allen, and Scott Chang attended and presented.  *See* Kinlaw 1st Decl.  ¶¶ 4–5.  Ms. Kinlaw did not attend the Relman presentation, but she asked one of her clients who uses a wheelchair to go to the podium at lunch and present his story regarding accessibility issues in the region, and Mr. Allen approached that client and the group afterwards.  *See id.* ¶¶ 6–7.  At the time, FHC was focused on receiving individualized legal assistance for each of its clients rather than pursuing a "systemic violation lawsuit," but had difficulties locating lawyers interested in taking on individual cases.  *See id.* ¶ 8.  According to Ms. Kinlaw, Mr. Allen requested that "we send some copies of some of our documents to him."  *See id.* ¶ 9.  Within a few weeks, Mr. Allen called FHC in Los Angeles after reviewing their documents and requested that Ms. Kinlaw send more documents for review.  *See id.* ¶ 9.

According to Ms. Kinlaw, in the fall of 2010, Mr. Allen "solicited the FHC to be one of his clients" in a "FCA Litigation in Los Angeles federal court."  *See id.* ¶ 10.  FHC expressed concerns about the litigation, but Mr. Allen persuaded them that they had a good case and that the Relman Firm should represent them.  *See id.* ¶¶ 11–14.  Ms. Kinlaw asserts that FHC  "just trusted that the Relman [F]irm knew what it was doing . . . We had no knowledge or experience in this, so we trusted them."  *See id.* ¶ 15.  In addition to the FCA Litigation, beginning in 2012, FHC and the Relman Firm pursued a Section 504 civil rights case with co-plaintiffs in the Central District of California in Los Angeles, which resulted in a settlement and payment of attorneys' fees to the Relman Firm.  *See id.* ¶¶ 16–18.  Citing conflict of interest concerns, FHC terminated the Relman Firm on December 18, 2016.  *See id.*  ¶¶ 18–24.

Ms. Kinlaw admits that FHC communicated with Mr. Allen, but emphasizes that no in-person meetings occurred in D.C. *See id.* ¶ 28. Although the Relman Firm submitted an email in which Ms. Ling purported to speak for both herself and FHC, Ms. Kinlaw denies that Ms. Ling was authorized to speak for FHC, and states that FHC neither knew about nor participated in that email when it was sent. *See* Kinlaw 2d Decl. ¶ 3–4. Further, Ms. Kinlaw asserts that to the extent that FHC sent any materials to the Relman Firm in D.C., it did so at the direction of the Relman Firm through either in-person meetings in California, phone calls, or e-mail correspondence. *See id.* ¶¶ 31–32.

Ms. Kinlaw also emphasizes the events that occurred in California. *See id.* ¶ 28. She contends that FHC was "solicited by Michael Allen in California to be [a] Relman firm client[]," the case involved Los Angeles issues, all in-person interactions occurred in Los Angeles, and FHC never attended any meetings in Washington, D.C. to discuss Relman's representation. *See id.* Finally, Ms. Kinlaw notes that no portion of the FCA Litigation or the Section 504 lawsuit was litigated in D.C. *See id.* ¶¶ 31–32.

### 3. *Declaration of Mei Ling*

Ms. Ling similarly attached a declaration to her Motion to Dismiss, alleging further factual disputes. *See generally* Ling Decl. Ms. Ling, a California resident, attended the 2010 Fair Housing Conference with no intentions to meet with or hire the Relman Firm, but she did intend to meet with two government officials regarding a fair housing complaint she had recently filed and to discuss ongoing disability discrimination and housing violations she believed she had experienced. *See id.* ¶¶ 3, 5. During the conference, she attended a keynote presentation unaffiliated with the Relman Firm and discussed her housing concerns with the speaker. *See id.* ¶ 7. During her conversation, Mr. Allen "interrupted . . . and asked if he could talk . . . about

[her] experiences in Los Angeles . . ." *See id.* After the luncheon portion, "Mr. Allen again approached [Ms. Ling] and asked if he could speak with [Ms. Ling], Sharon Kinlaw, and another person . . . [Ms. Ling] shared with him [her] experiences, and he requested that [Ms. Ling] send him any documents and evidence [she] had supporting the allegations of disability discrimination." *See id.* ¶ 9. Ms. Ling represents that Mr. Allen contacted her on multiple occasions for "several months" to request documents, "persuading" and "urging [her] to retain him" as her lawyer. *See id.* ¶ 11. When Mr. Allen notified Ms. Ling that he had drafted a FCA complaint and "insisted" that the Relman Firm represented her and FHC as co-relators in the matter, Ms. Ling expressed reluctance. *See id.* ¶¶ 12–14. Mr. Allen told Ms. Ling that he was not admitted to practice in California and asked her for local counsel recommendations, although he ultimately rejected the recommendations. *See id.* ¶ 14.

Ms. Ling admits that she signed the Agreement, but notes that she never traveled to the District of Columbia to discuss the Agreement or any aspect of the FCA Litigation. *See id.* ¶¶ 15–17. Like Ms. Kinlaw, Ms. Ling contends that to the extent that she sent materials to the Relman Firm, she did so at the firm's request and direction. *See id.* ¶ 19. All in-person interactions between Ms. Ling and the Relman Firm occurred in California. *See id.* Ms. Ling alleges that she never requested or directed the Relman Firm to conduct work outside of California. *See id.*

With respect to the litigation in which the Relman Firm represented her, Ms. Ling notes that the Relman Firm filed her FCA claim and a separate individual case against the City of Los Angeles in the Central District of California. *See id.* ¶¶ 18–19. Eventually, Ms. Ling terminated the Relman Firm in its representation of her in the FCA Litigation and emailed a letter to the

Relman Firm's attorneys seeking to void the Agreement.  *See id.*  ¶ 25; Ex. 3 (4/30/2018 Ling Email to Relman Firm Counsel), ECF No. 22-5.

### 4.     *The Retainer Agreements*

The Agreements, written on the Relman Firm's letterhead with a Washington D.C. address, state that the Relman Firm will represent both FHC and Ms. Ling with "legal services in connection with the litigation of False Claims Act allegations against the City of Los Angeles and/or the Community Redevelopment Agency of the City of Los Angeles . . ." as co-relators. FHC Agreement 1, ECF No. 14-3; Ling Agreement 1, ECF No. 14-4.  The Agreements address attorneys' fees, stating that "[i]n the event relief is obtained, the Client agrees that the Firm is entitled to its reasonable attorneys' fees, in addition to [other] costs . . ." *See id.* at 2.

The Agreements contain a Choice of Law section, which states that the Agreements will be governed in accordance with the law of the District of Columbia.  *See id.* at 4.  Above the signature block, there is language that states, "Your signature below signifies that you have carefully read over and fully understand the above and request the services and assistance described therein." *See id.*  Diana Bruno, then-Executive Director of FHC, signed the FHC Agreement, and Ms. Ling signed her agreement.  *See* FHC Agreement at 4; Ling Agreement at 4.

### 5.     *Email Communications*

All three parties attached similar business email communications.  The Relman Firm includes several emails prior to its formal representation of FHC and Ms. Ling.  One such email is an email from Ms. Ling to Mr. Allen, allegedly sent within 10 days of their initial meeting in California.  *See* Allen 2d Decl. ¶ 13; Pl.'s Opp'n to Ling, Ex. A (2010 Email from Mei Ling to Relman Firm), ECF No 26-2.  In the email, Ms. Ling thanks Mr. Allen for "taking the time to discuss our matter with us while at the Fair Housing Conference in San Diego," encloses

documents for Mr. Allen's review, and requests Mr. Allen to "advise" her as to what other documents would be helpful for him "to make a determination if this disability discrimination issue is one that we can work together on." *Id.* She stated that she "hoped a precedent can be set with a strong message" regarding fair housing compliance. *Id.* Ms. Ling signed the email, listed a phone number, and her signature line stated ". . . and for [other individuals] and Fair Housing Council's Sharon Kinlaw," which suggests that she wrote the email on behalf of FHC and the other individuals listed. *Id.* In a separate email to Mr. Allen sent before Ms. Ling formally retained the Relman Firm, Ms. Ling asked whether Mr. Allen needed any additional documents "to assist your analysis of the myriad of false claims, disability discrimination, civil rights violations, systemic issues, etc. . ." *Id.*, Ex. B (March 4, 2010 Email from Ling), ECF No 26-3; no FHC representative was copied on that email. Five days later, Ms. Ling sent a separate email to both Mr. Allen and Ms. Kinlaw, thanking Mr. Allen for a prior phone conversation and urging him to connect with Ms. Kinlaw. Ms. Ling made clear that she hoped the Relman Firm would help change systemic issues in Los Angeles. *See id.*, Ex. C (March 9, 2010 Email from Mei Ling), ECF No. 26-4. Less than a week later, Ms. Ling sent another email solely to Mr. Allen, titled "STATUS ??" urging him to "please, please, please" touch basis with an update, noting that she had called his office paralegal. *Id.*, Ex. D (March 15, 2010 Email from Mei Ling), ECF No. 26-5.

Nearly seven years later, FHC, via email, terminated the Relman Firm and later communicated its desire to void the Agreement. *See id.*, Ex. I (Oct. 23, 2017 Email from FHC "Voiding" Contract), ECF No. 26-10; Pl.'s Opp'n to FHC, Ex. E (Dec. 18, 2016 FHC Termination Email), ECF No. 14-6. Similarly, Ms. Ling terminated the Relman Firm via email and mailed a letter to void the Agreement. *See id.*, Ex. D (Dec. 19, 2016 Email from Mei Ling),

ECF No. 14-5; *id.*, Ex. G (April 30, 2018 Letter from Mei Ling "Voiding" Contract), ECF No. 14-8.

### B.    Personal Jurisdiction Analysis

"A non-resident's mere retention of a D.C.-based service provider, absent any other deliberate contact with the forum — demonstrated either by the terms of the contract itself or by the non-resident's actual dealing with the district — cannot qualify as a 'minimum contact.'" *Thompson Hine,* 734 F.3d at 1194; *see also Exponential Biotherapies, Inc. v. Houthoff Buruma N.V.*, 638 F. Supp. 2d 1, 7 (D.D.C. 2009) (concluding that entering into a contract with an out-of-state party by itself does not establish minimum contacts or constitute purposeful availment) (citing *Helmer*, 393 F.3d 201, 205 (D.C. Cir. 2004)).  Accordingly, although it is undisputed that the Relman Firm is based in D.C., and that the attorneys assigned to the FCA Litigation worked in the firm's D.C. office, that does not independently subject Defendants to suit in this Court. Instead, the Court must consider whether the record evidence as a whole demonstrates that FHC and Ms. Ling had sufficient contacts with D.C. to satisfy due process.  The undersigned concludes that Defendants' contacts were sufficient to establish personal jurisdiction in this Court, for the reasons set forth below.

First, Ms. Ling and FHC signed Agreements that contained a choice-of-law provision that stated that the agreements would be "governed in accordance with the laws of the District of Columbia."  *See* FHC Agreement at 4; Ling Agreement at 4.  Although choice-of-law provisions do not automatically confer personal jurisdiction, they "reinforce deliberate affiliation with the forum state and a reasonable foreseeability of possible litigation there."  *Burger King,* 471 U.S. at 482.  Indeed, courts frequently cite the presence or absence of choice-of-law provisions when evaluating whether defendants who are parties to a contract with a plaintiff have minimum

contacts with the forum where the plaintiff-company does business. *See, e.g.*, *Health Comm'ns Inc.*, 860 F.2d at 464 n.2 (identifying fact that contract at issue did not contain a choice-of-law provision as one of the facts demonstrating a lack of sufficient contacts); *United Therapeutics Corp. v. Vanderbilt Univ.*, 278 F. Supp. 3d 407, 461 (D.D.C 2017) (considering the existence of a Tennessee choice-of-law provision as a final factor to determine that jurisdiction did not exist in D.C.); *Xenophon Strategies,* 2016 WL 1367734, at *4 (identifying D.C. choice-of-law provision in agreement as a factor that distinguished the case from *Thompson Hine* and supported a finding that defendants had minimum contacts with D.C.). Thus, the fact that both FHC and Ms. Ling signed agreements that contained a choice-of-law provision invoking D.C. law supports a finding that they affiliated themselves with D.C. and could foresee that litigation regarding the Agreements might occur in D.C.

Second, although Defendants did not travel to D.C. to meet in person with Relman attorneys, they communicated extensively with the Relman Firm. Mr. Allen and his colleagues "frequently communicated with Ms. Kinlaw and Ms. Ling by phone or email from the District of Columbia." Allen 1st Decl. ¶ 17. Mr. Allen received more than two hundred emails from Ms. Ling and Ms. Kinlaw. Ms. Ling sent 276 emails to Mr. Allen between February 2010 and December 2017. Allen 2d Decl. ¶ 17. Ms. Kinlaw sent Mr. Allen more than 100 emails about the FCA Litigation. *See* Allen 1st Decl ¶ 14. Ms. Ling and Ms. Kinlaw both sent documents to Mr. Allen's District of Columbia address by mail and email. *See* Allen 1st Decl. ¶¶ 13, 15, 30. Mr. Allen and other Relman Firm attorneys also spoke with Ms. Ling and Ms. Kinlaw by telephone while in D.C. Allen 1st Decl. ¶¶ 16–17, 30. Those communications do not independently suffice to subject defendants to this Court's personal jurisdiction. *See Exponential Biotherapies, Inc.,* 638 F. Supp. 2d at 9 ("[T]elephone calls, emails, facsimiles and mailings,

including invoices . . . are insufficient to subject [defendant] to this Court's personal jurisdiction."); *Lans v Adduci Mastriani & Schaumberg L.L.P.,* 786 F. Supp. 2d 240, 271 (D.D.C. 2011) (finding that regular communications into D.C. regarding defendant's representation "unquestionably qualify as contacts" for jurisdictional analysis, but alone did not confer personal jurisdiction). Nonetheless, they are pertinent to the Court's analysis and provide further support for a finding that FHC and Ms. Ling had minimum contacts with D.C. *See, e.g.*, *Xenophon Strategies,* 2016 WL 1367734, at * 5 (identifying parties' numerous post-performance communications as evidence of defendant's continuing contacts with D.C.).

Third, although the FCA Litigation was pending in the Central District of California, for the approximately seven-year duration of their attorney-client relationship, the Relman Firm performed nearly all of its work for Ms. Ling and FHC in D.C. The Relman Firm is a D.C.-based firm that has no office in California; the record contains no evidence suggesting that Defendants were unaware of that fact, or unaware that Mr. Allen and his colleagues worked from the D.C. office, when Defendants retained the firm. Mr. Allen estimated that ninety-five percent of the Relman Firm's work on the FCA case, including the filing of at least one pleading, was done by Relman attorneys working from the firm's D.C. office. *See* Allen 1st Decl. ¶ 29. That work included conducting factual and legal research, drafting a disclosure statement, and meeting with Department of Justice attorneys in Washington, D.C. *See* Allen 1st Decl. ¶ 28.

As there is no evidence that Ms. Ling or FHC expressly asked the Relman attorneys to conduct that work in D.C., the location where those tasks were performed does not independently demonstrate that Ms. Ling and FHC had minimal contacts with D.C. *See, e.g.*, *Thompson Hine*, 734 F.3d at 1194 (concluding simply performing work for non-resident clients in the District is insufficient to establish personal jurisdiction); *Exponential Biotherapies*, 638 F.

Supp. 2d at 7–8 (noting that entering into a contract with a D.C. client, by itself, does not suffice to establish that an out-of-state law firm had minimal contacts with D.C.); *see generally Walden v. Fiore*, 571 U.S. 277, 284–85 (2014) (emphasizing that minimum contacts must arise "from actions by the defendant himself that create a substantial connection with the forum State" and that the plaintiff's own contacts cannot be "decisive" to the due process analysis); *Health Services*, 860 F.2d at 464–65 (concluding that a purchaser "who selects an out-of-state seller's goods or services . . . does not thereby purposefully avail itself . . . and does not merely by purchasing from the seller submit to the laws of the jurisdiction in which the seller is located or from which it ships merchandise). *But see Mouzavires v. Baxter,* 434 A.2d 988, 995 (D.C. 1981) (noting that, given modernized communication, jurisdiction can be sustained when the nonresident defendant's only contact with the forum has been by mail or telephone); *Fisher v. Bander,* 519 A.2d 162 (D.C. 1986) (finding personal jurisdiction when an out-of-state defendant called a D.C. firm and requested its services).[3]

However, neither the D.C. Circuit nor the Supreme Court has held that courts must completely disregard the location where the plaintiff performed work on a contract when evaluating the defendant's connection to a forum. Here, the Relman Firm's performance of nearly all of its work in D.C. is relevant to the Court's analysis because Defendants' decision to retain D.C. attorneys to conduct research and other tasks necessary to develop their case for litigation, and their maintenance of that relationship for approximately seven years, provides evidence that the parties' dealings and business relationship had a connection to D.C. This

---

[3] The D.C. Circuit has rejected the reasoning of *Mouzavires* and *Fisher*, concluding that by "exercising jurisdiction with such limited relationships to the District, these cases . . . appear to have adopted the very kind of 'mechanical test' that *Burger King* rejected." *Thompson Hine,* 734 F.3d at 1193.

connection would be more significant to the Court's analysis if the FCA Litigation were pending in D.C. *Cf. Lans*, 786 F. Supp. 2d 240 (noting that defendant's retention of plaintiff to handle a matter in D.C. supported personal jurisdiction in D.C.). And, as noted above, this connection cannot be dispositive. Nonetheless, it is relevant to the Court's analysis.

Fourth, the parties dispute who first solicited the relationship between them, but overestimate the significance of the origin of the relationship. The Relman Firm asserts that Defendants initiated the conversations about retaining the Relman Firm to represent them, whereas Ms. Ling and Ms. Kinlaw contend that the Relman Firm initiated and pursued the relationship. *Compare* Kinlaw Decl. ¶¶ 8–10 *and* Ling Decl. ¶¶ 11–15 *with* Allen 1st Decl. ¶ 18 and Allen 2d Decl. ¶¶ 8–15. Absent an evidentiary hearing, factual disputes should be resolved in favor of the plaintiff. *See Helmer v. Doltskaya*, 393 F.3d 201, 209 (D.C. Cir. 2004). But even crediting the Relman Firm's account of which party first approached the other, the solicitation began in California when the parties met at a conference, and thus does not establish a significant tie between Defendants and D.C. Further, although courts may consider whether the defendant affirmatively sought out the plaintiff as part of evaluating the connection between the contract and the relevant forum, merely reaching out to an out-of-state company to purchase goods or services does not establish minimum contacts. *See Health Comms.*, 860 F.2d at 464–65. *But see Lans*, 786 F. Supp. 2d at 272 (finding jurisdiction where foreign defendants solicited D.C. law firm to initiate lawsuit that was ultimately filed in Washington D.C.). To the extent that Ms. Ling's and FHC's pre-retainer emails and telephone calls with the Relman Firm can be construed as soliciting an attorney-client relationship, the undersigned has already considered those communications in the analysis above. Consequently, the Relman Firm's characterization of

Defendants as the initiators of the attorney-client relationship does not significantly impact the undersigned's jurisdictional analysis.

Although the choice-of-law clause, the parties' communications, and the location of the Relman Firm's performance of its work would not establish personal jurisdiction if viewed in isolation, when considered collectively, the record evidence demonstrates that both Ms. Ling and FHC had sufficient contacts with D.C. to be subject to personal jurisdiction in the instant suit. By selecting a D.C. firm and specifically choosing lawyers who worked in the D.C. office, communicating extensively with those D.C. attorneys both before and after the Agreements were signed, agreeing that their relationship would be bound by D.C. law, and continuing to work with the Relman Firm for nearly seven years before terminating the attorney-client relationship, Defendants established a substantial connection between themselves and this forum. To be sure, the facts of this case differ in some respects from other cases where courts have found that a defendant's contacts with the forum establish personal jurisdiction. Unlike the defendants in *Koteen v. Bermuda Cablevision*, Defendants did not travel to D.C. for in-person meetings and contract negotiations. *See Koteen*, 913 F.2d 973 at 975 (upholding exercise of personal jurisdiction over non-resident who retained a D.C. law firm, visited the firm multiple times, and communicated extensively with the firm by telephone and mail). However, in-person meetings are not a necessary prerequisite to personal jurisdiction. Indeed, the Supreme Court has expressly held that "[j]urisdiction . . . may not be avoided merely because the defendant did not physically enter the forum state," and noted that "it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines." *Burger King*, 471 U.S. at 476; *see also Xie v. Sklover & Company LLC*, (noting that Supreme Court precedent makes clear that "a physical presence is not a prerequisite

for the exercise of personal jurisdiction over a defendant"). The record also does not indicate that Defendants hired the Relman Firm specifically because of the firm's experience in D.C.-specific issues. *See, e.g.*, *Xenophon*, 2016 WL 1367734 at *4 (noting that defendant selected firm based on plaintiff's D.C.-specific expertise); *Fisher,* 519 A.2d at 165 (noting that defendant selected D.C. firm based on its subject matter expertise in a practice area strongly associated with D.C. lawyers). A desire to rely upon a firm's expertise in matters unique to a specific forum may further the jurisdictional analysis, but it is not a prerequisite for personal jurisdiction. The minimum contacts analysis is not a "mechanical test" that turns solely on the presence of specific factors, but rather requires an evaluation of the parties "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing.'" *Thompson Hine,* 734 F.3d at 1190. The dealings and relationship between the parties between 2010 and 2017 suffice to satisfy that standard.

*Thompson Hine* does not require a contrary result. In *Thompson Hine*, the D.C. Circuit concluded that this Court lacked personal jurisdiction over a fee payment dispute arising from a Florida resident's retention of lawyers at an Ohio-based law firm's D.C. branch to represent him in a case in Oregon. *See Thompson Hine,* 734 F.3d at 1188. After the defendant signed a retainer agreement written on D.C. letterhead, at least two D.C. attorneys performed all the work on both an Oregon and a separate Federal Drug Administration matter and allegedly exchanged at least ten emails with the defendant regarding the Oregon and FDA action. *Id.* at 1188–89. The Circuit concluded that by simply retaining Washington D.C. lawyers, the defendant never "'purposefully availed himself of the privilege of conducting activities' of the District." *Id.* at 1194 (citing *Hanson,* 357 U.S. at 253).

There are significant distinctions between *Thompson Hine* and the relationship between Defendants and the Relman Firm.  First, unlike FHC and Ms. Ling, the defendants in *Thompson Hine* did not sign agreements containing a choice-of-law provision indicating that D.C. law would control.  *See Thompson Hine*, 734 F.3d at 1192 (noting absence of D.C. choice-of-law provision and observing that the presence of such provisions "can be indicative of the parties' own perceptions of their degree of contact with a particular forum").  Second, the record in *Thompson Hine* "contained no evidence of meetings, phone calls, or emails between [the defendant] and the firm's D.C.-based lawyers" regarding the litigation at issue in the contract dispute, beyond a vague assertion that ten emails were exchanged regarding that matter and another matter.  *See id.*  Here, in contrast, Ms. Ling and FHC exchanged hundreds of emails with D.C.-based Relman attorneys, and also communicated by mail and telephone.  Third, in *Thompson Hine*, the Court found it noteworthy that the pertinent agreement lasted only seven months.  *See id.* (contrasting seven-month duration of retainer with the lengthier relationships at issue in *Burger King* and *Health Communications*).  Here, in contrast, Defendants worked with the Relman Firm for nearly seven years, thereby engaging in a continuing relationship with the firm's D.C. attorneys.

For the foregoing reasons, the undersigned recommends that the Court find that it has personal jurisdiction over both Defendants and therefore deny Defendants' motion to dismiss pursuant to Federal Rule of Procedure 12(b)(2).

## III.    VENUE IS PROPER IN THIS COURT

Defendants also argue that venue is improper in this Court.  *See* FHC MTD at 41–45; Ling MTD at 26–28.  Venue is proper in the district where: (1) a defendant resides, if all defendants reside in the same state; (2) a substantial part of the events giving rise to the suit

occurred, or a substantial part of property that is the subject of the suit is located; or (3) if venue would not be proper in any district for those reasons, wherever the defendants are subject to personal jurisdiction. 28 U.S.C. § 1391(b). As Defendants are not D.C. residents, *see* 28 U.S.C. § 1391(c)(1), the resolution of this issue turns on whether "a substantial part of the events or omissions giving rise to the claim occurred" in D.C. 28 U.S.C. § 1391(b).

The facts that give rise to personal jurisdiction over Defendants also make venue proper in this Court. Section 1391(b) requires only that a "substantial portion" of the events occur in a forum. "Thus, the question is not which district is the best venue, or which venue has the most significant connection to the claim. The question is whether the district the plaintiff chose had a substantial connection to the claim, whether or not other forums had greater contacts." *Exelon Generation Co., LLC v. Grumbles*, 380 F. Supp. 3d 1, 11 (D.D.C. 2019) (internal quotation marks omitted); *see also Douglas v. Chariots for Hire*, 918 F. Supp. 2d 24, (D.D.C. 2013); *Kelly v. MD Buyline, Inc.*, 2 F. Supp. 2d 420, 439 (S.D.N.Y. 1998) (noting venue is proper in "a district in which "a substantial" portion of the relevant events took place, even if a greater portion of those events occurred elsewhere"). Although Defendants emphasize this case's connection to California, it is undisputed that the Relman attorneys performed approximately ninety-five percent of their work on the FCA Litigation in D.C., that Mr. Allen and his colleagues were based at the Relman Firm's D.C. office, and that the parties communicated between D.C. and California by email, mail, and telephone. *See* Part I at 3–5, *supra* (discussing affidavits regarding the locations where the facts underlying this dispute occurred). Defendants sent their notices of their intent to repudiate the Agreements via email to Mr. Allen, a D.C.-based attorney, and then subsequently mailed a letter providing formal notice of their repudiation of the Agreements. *Id.* Consequently, a substantial portion of the events concerning Defendants'

retention of the Relman Firm to represent them in the FCA Litigation, which includes the Relman Firm's conduct in furtherance of that attorney-client relationship and Defendants' repudiation of the Agreements, occurred in D.C. *See Braude & Marguiles, P.C. v. Fireman's Fun Ins. Co.,* 468 F. Supp. 2d 190, 195 n. 1 (D.D.C. 2007) (noting that for a breach of contract claim that arose from a D.C. firm's representation of a non-D.C. client, venue was proper in D.C. because the D.C. firm "must have rendered a substantial portion of the legal services at issue in its D.C. office"); *Kelly*, 2 F. Supp. 2d at 440 (finding venue proper in New York for a breach of contract claim where contract was partially negotiated and amended in New York, the plaintiff's conduct in performance of the agreement principally occurred in New York, and the defendant repudiated the contract by sending a written communication to plaintiff in New York); *see generally Estate of Abtan v. Blackwater Lodge & Training Ctr.,* 611 F. Supp. 2d 1, 9 (D.D.C. 2009) (noting that venue is proper in breach of contract actions "where the contract was negotiated or executed, where the contract was to be performed, and where the alleged breach occurred") (citing Wright et al., *supra,* § 3806).

IV. **THE INTEREST OF JUSTICE AND CONVENIENCE OF PARTIES AND WITNESSES SUPPORT TRANSFERING THIS CASE TO THE CENTRAL DISTRICT OF CALIFORNIA**

Although venue is proper, the Court has discretion to transfer this action to another forum pursuant to 28 U.S.C. § 1404(a). FHC principally contends that personal jurisdiction is lacking and venue is improper in this Court, but alternatively argues that the case should be transferred to the U.S. District Court for the Central District of California for the convenience of the parties. *See* FHC MTD at 46. Similarly, Ms. Ling seeks transfer to the U.S. District Court for the

Central District of California on *forum non conveniens* grounds[4] as an alternative to dismissal. *See* Ling MTD at 29–30.

For the "convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). The party moving to transfer venue bears the burden of establishing that convenience and the interests of justice weigh in favor of transfer. *See Int'l Bhd. of Painters & Allied Trades Union v. Best Painting & Sandblasting Co., Inc.*, 621 F. Supp. 906, 907 (D.D.C. 1985). The court should first determine whether the action *could* have been brought in another venue, and next whether it *should* be brought in another venue. *See Nat'l Women's Pol. Caucus, Inc. v. Metro. Louisville Women's Pol. Caucus, Inc.,* 359 F. Supp. 3d 13, 25 (D.D.C. 2019); *see also Stewart Org. v. Ricoh Corp.*, 487 U.S. 22, 29–30 (1988) (explaining that the threshold question is whether the case could have been brought in the district to which transfer is sought). To determine whether transfer is proper, courts exercise their broad discretion to balance case-specific factors related to the public interest of justice and the private interests of the parties and witnesses. *See Stewart*, 487 U.S. at 29–30. The undersigned recommends a discretionary transfer to the Central District of California for the reasons articulated below.

### A.      This Case Could Have Been Filed in the Central District of California

As noted supra, venue is proper in the district where a substantial portion of the events giving rise to the litigation arise. Venue would lie in the Central District of California because:

---

[4] The Relman Firm suggests that Ms. Ling erroneously invoked the doctrine of *forum non conveniens*, asserting that the doctrine applies only to requests to transfer a matter to a foreign forum. *See* Opp'n to Ling MTD at 34. However, 28 U.S.C. § 1404(a) is "a codification of the doctrine of *forum non conveniens* for the subset of cases in which the transferee forum is within the federal court system." *Atlantic Marine Const. Co., Inc. v. U.S. District Ct. for the Western District of Texas*, 571 U.S. 49, 61 (2013). Therefore, the undersigned will construe Ms. Ling's *forum non conveniens* argument as a request to transfer pursuant to Section 1404(a).

this lawsuit originates from Defendants' agreements to retain the Relman Firm to represent them in the FCA Litigation pending in the CACD; Defendants executed the Agreements in California; and Defendants sent their repudiation letters from California. Therefore, the Relman Firm could have brought this case in the Central District of California.

### B. The Private and Public Interests

#### 1. Private Interests

When assessing the private interests in transfer, courts consider: "(1) the plaintiff's choice of forum; (2) the defendant's choice of forum; (3) whether the claim arose elsewhere; (4) the convenience of the parties; (5) the convenience of the witnesses; and (6) the ease of access to sources of proof." *Aishat v. U.S. Dep't of Homeland Sec.,* 288 F. Supp. 3d 261, 268 (D.D.C. 2018). Courts typically accord substantial deference to a plaintiff's home forum. *See Piper Aircraft Co. v. Reyno*, 454 U.S. 235 (1981).

#### a. The Parties' Choice of Forum

The plaintiff's choice of forum is typically a "paramount consideration." *Aishat*, 288 F. Supp. 3d at 268. The Relman Firm has selected this Court as a forum and contends that the case should remain here because most of the events giving rise to this case occurred in D.C., and a transfer to California would greatly inconvenience the Relman Firm and several witnesses based in D.C. *See* Pl.'s Opp'n to FHC at 30–31;Pl.'s Opp'n to Ling at 36–37. The factors that typically weaken deference to a plaintiff's choice of forum — when the plaintiff has chosen a forum that is not its home forum or "there is an insubstantial factual nexus between the case and the plaintiff's chosen forum" — are not present here. *New Hope Power Co. v. U.S. Army Corps of Engineers*, 724 F. Supp. 2d 90, 95–96 (D.D.C. 2010); *see Defenders of Wildlife v. Jewel*, 74 F. Supp. 3d 77, 84–85 (D.D.C. 2014). Therefore, the Relman Firm's choice of forum weighs

strongly against transferring venue. *See generally Sierra Club v. Van Antwerp*, 523 F. Supp. 2d 5, 11 (D.D.C. 2007) (noting that courts typically apply a "strong presumption in favor of the chosen forum" when a plaintiff desires to litigate in its home forum).

The Court next considers Defendants' choice of forum. Defendants have legitimate reasons for seeking a transfer to California. Ms. Ling resides in California, and FHC's office and employees are in that state. *See* Ling Decl. ¶ 26; Kinlaw 1st Decl. ¶ 2. Significantly, the FCA Litigation from which this suit arises is pending in the Central District of California, and the Agreements make the Relman Firm's recovery of fees contingent upon Defendants' ability to prevail or otherwise obtain relief in the FCA Litigation. Defendants have pointed to alleged conflicts of interest or improper litigation decisions as justification for their termination of the Agreements, thereby calling into question decisions and actions made in the FCA Litigation. Thus, Defendants' choice of forum would place this case in a district with strong connections to the case.

In sum, given the strong presumption of the plaintiff's choice of venue, this factor slightly weighs against transfer.

### b.    <u>Where the Claim Arose</u>

The parties dispute whether this claim arose in Washington, D.C. or California. However, it is clear that the decisions and actions on which this case is based occurred in both jurisdictions: the Agreements were signed in both California (by Defendants) and Washington, D.C. (by Mr. Allen); pertinent communications were sent from California to D.C. and *vice versa*; and the legal work was primarily performed in D.C. for a case pending in federal court in California. Therefore, this factor is neutral. *See Douglas*, 918 F. Supp. 2d at 32 (noting that

when "claims arise from actions in several fora, this factor does not weigh in favor or against transfer").

### c.     The Convenience of the Parties and Witnesses

"Litigating in a particular forum is likely to inconvenience one party or another unless all parties reside in the chosen district." *Defenders of Wildlife*, 74 F. Supp. 3d at 85. FHC suggests that litigating the case in D.C. would inconvenience it because its employees and witnesses are all located in California. *See* FHC MTD at 45. Ms. Ling also asserts that litigating in D.C. would pose a hardship because she resides in California, has limited means, and uses a wheelchair, all of which would make cross-country travel to D.C. "both physically and financially onerous." Ling Decl. ¶ 26; *see also* Ling MTD at 30. The Relman Firm asserts that litigating in California would greatly inconvenience it and the witnesses based in D.C. *See* Opp'n to Ling MTD at 36.

The witnesses are based in both D.C. and California. Mr. Allen and two other Relman attorneys who worked on the FCA Litigation, as well as a former paralegal, work in the District of Columbia. *See* 2d Allen Decl. ¶ 48. If Department of Justice attorneys are called as witnesses, at least two of those attorneys work in D.C. *See id.* ¶ 48. FHC has identified several potential witnesses who reside or work in California: a former Relman attorney who signed the complaint filed in the FCA Litigation; witnesses who spoke to a Relman attorney at the 2010 conference and use wheelchairs; all FHC employees and their agents; the FHC's investigators; and the California-based prosecutors who assisted in investigating the FCA Litigation. *See* FHC MTD at 42–45.

The convenience of the parties and witnesses slightly favors transfer. Both parties have identified witnesses who reside in their preferred forum, and contend that cross-country travel

would pose a hardship. However, travelling to D.C. would pose a more significant burden for Ms. Ling (who cites physical and financial barriers to travel) than the general hardship of travel that the Relman Firm has cited. That tilts this factor slightly in favor of transferring the case to California.

### d.     <u>Ease of Access to Sources of Proof</u>

There is no reason to believe that the location of the federal court that reviews this case would impact the accessibility of the documents or other evidence supporting the parties' respective positions. "Modern technology allows most documentary evidence to be easily transferred," thus making "the location of documents . . . much less important to determining the convenience of the parties than it once was." *Taylor v. Shinseki*, 13 F. Supp. 3d 81, 90 (D.D.C. 2014). Accordingly, this factor is neutral. *See id.*

### 2.     *The Public Interest*

When assessing whether the public interest favors transfer, relevant considerations include: "(1) the transferee's familiarity with the governing laws; (2) the relative congestion of the calendars of the transferor and transferee courts; and (3) the local interest in having local controversies decided at home." *Aishat*, 288 F. Supp. 3d at 268. When related or similar litigation is pending in the transferee forum, that also factors into the court's analysis of the public interest factors. *See Bartolucci v. 1-800 Contacts, Inc.*, 245 F. Supp. 3d 38, 50 (D.D.C. 2017); *Defenders of Wildlife v. Jewel*, 74 F. Supp. 3d 77, 85 (D.D.C. 2014)

### a.     <u>Familiarity with the Governing Law</u>

The Agreements' choice-of-law provisions subject the contracts to D.C. law. If those choice-of-law provisions are enforceable and binding, this Court's greater familiarity with D.C. law would weigh against transfer to the Central District of California. *See Hispanic Affairs*

*Project v. Perez*, 206 F. Supp. 3d 348, 377 (D.D.C. 2016) (finding that interest of justice favored transferring action to the federal court that is familiar with the state law governing certain claims). However, Defendants contend that California law governs aspects of this case. Specifically, FHC contends that the Relman Firm's initiation of this lawsuit violated the California Mandatory Fee Arbitration Act ("CMFAA") and the rules governing practice in California federal and state courts. *See* FHC MTD at 10–12. FHC also asserts that California law permitted it to void its retainer agreement. *See* FHC MTD at 22. Ms. Ling suggests that the parties' dispute regarding the validity of the Agreements will require "the application of California Business & Professions Code section 6147." Ling MTD at 25. Although the Relman Firm contends that the Agreements' choice-of-law provisions exempt it from the California laws that Defendants invoke, resolving that issue will likely require the reviewing Court to determine whether enforcing the choice-of-law provision would "contravene a fundamental policy" of California. *Orchin v. Great-West Life & Annuity In's. Co.*, 133 F. Supp. 3d 138, 148 (D.D.C. 2015). The Los Angeles County Bar Association's Dispute Resolution Services, Inc. Fee Arbitration Program concluded that choice-of-law provisions could neither abrogate nor waive Defendants' right to arbitration under the CMFAA, citing precedent from California state courts. *See* Notice of Related Ruling, ECF No. 21-1. A court reviewing the choice-of-law issue might reach the same result.

Thus, the parties' dispute potentially implicates both D.C. and California law. At this stage, without having reviewed the merits defenses or the scope of the CMFAA, the Court cannot determine which state's laws will predominate. Although the presence of the choice-of-law provision in the Agreements suggests that D.C. law will control, a court may determine that California's fee arbitration laws trump the choice-of-law provision. Therefore, this factor is

neutral. *See Bederson v. U.S.*, 756 F. Supp. 2d 38, 52–53 (D.D.C. 2010) (weighing a court's state law familiarity as neutral when the law of both the transferor and potential transferee court governed claims).

### b.  Pendency of Related Litigation

The fact that the FCA Litigation is pending in the Central District of California creates a strong connection to that forum.  Defendants' merits arguments rest at least partially on the propriety of litigation decisions that the Relman Firm made in the FCA Litigation and a separate matter pending in the Central District of California.  *See* FHC MTD at 19–21 (alleging that litigation decisions revealed a conflict of interests between the Relman Firm's representation of FHC and other clients).  In addition, to resolve Ms. Ling's defense that the Relman Firm has failed to state a claim for anticipatory breach of contract because no damages will exist until she obtains monetary relief in the FCA Litigation, a court will need to review the procedural posture and outcome of the FCA Litigation.  *See* Ling MTD at 30–31.  In their supplemental briefs, the parties dispute whether recent developments in the FCA Litigation weaken Defendants' arguments or render the case moot.  *See* Pl.'s Supp. Auth. at 1–3; FHC Supp. Auth. Resp. at 1–2. As the Court presiding over the FCA Litigation, the Central District of California is knowledgeable of those issues and well positioned to resolve the parties' dispute.  Therefore, this factor favors transfer.  *See Defenders of Wildlife*, 74 F. Supp. 3d at 86–87 (concluding interests of justice favored transfer of case to court where related lawsuits were pending); *Barham v. UBS Financial Servs.*, 496 F. Supp. 2d 174, 180—81 (finding pendency of related litigation in Maryland to be "the most significant factor weighing in favor of transferring this case" and noting that "courts have transferred cases to jurisdictions with related pending matters even when the cases merely shared similar facts, rather than similar legal claims").  *Cf. Wyandotte Nation v.*

*Salazar*, 825 F. Supp. 2d 261, 267 (D.D.C. 2011) (finding transfer appropriate where proposed transferee Circuits had "specialized knowledge both of the parties, their history of litigation, and the statute at issue").

### c.    <u>Local Interest in Resolving the Controversy</u>

This factor typically evaluates the litigation's likely impact on residents of the competing federal districts. *See Preservation Soc. of Charleston v. U.S. Army Corps of Engineers,* 893 F. Supp. 49, 57 (D.D.C. 2012). This case is a contract dispute between three parties — two California residents and a D.C. law firm. California's interest in protecting its residents' alleged right to terminate an attorney-client relationship is no greater than the District of Columbia's interest in ensuring that its law firms are properly compensated for work they have performed. Therefore, this factor is neutral. *See Malveaux v. Christian Brothers Servs.*, 753 F. Supp. 2d 35, 41 (D.D.C. 2010) (noting that local interests did not weigh in favor of either forum in a contract dispute between residents of two states because each state had a local interest in the dispute).

### d.    <u>Relative Congestion of the Courts</u>

Defendants do not address the relative congestion of the courts, and consequently there is no evidence that the Central District of California's docket is disproportionately heavier than this Court's docket. Thus, there is no basis to conclude that the Central District of California's docket is too heavy for this case to be transferred. *See Preservation Soc. Of Charleston v. U.S. Army Corps of Engineers*, 893 F. Supp. 2d 49, 57 (D.D.C. 2012) ("Absent a showing that either court's docket is 'substantially more congested' than the other, this factor weighs neither for nor against transfer."); *Harris v. U.S. Dep't Vet Affairs*, 196 F. Supp. 3d 21, 25 (D.D.C. 2016) (finding in the absence of briefing from the parties that there was "no reason to suspect that the District of Maryland's docket could not accommodate this case") (citing *Barham v. UBS Fin.*

*Servs.*, 496 F. Supp. 2d 174, 180 (D.D.C. 2007)).  In addition, as this case is at the 12(b) stage,

transfer is unlikely to delay the resolution of the case.  *See Vaney v. Starbucks Corp.*, 559 F.

Supp. 2d 78, 84 (D.D.C. 2008) (concluding that proposed transfer would not unduly delay the

case given that "the case ha[d] not evolved past the earliest stages of litigation").  Therefore, this

factor is neutral.  *See Preservation Soc.*, 893 F. Supp. 2d at 57.

### 3.    *The Balance of Public and Private Interests Favors Transfer*

After weighing the private and public interests in transfer, the undersigned recommends

that the Court grant Defendants' motion to transfer this case to the Central District of California.

The Relman Firm's selection of D.C. carries considerable weight and favors denying

Defendants' transfer request.  However, the convenience of the parties and witnesses — at least

one of whom has a disability and financial circumstances that would inhibit travel to D.C. —

favors transfer to the Central District of California.  More significantly, the pendency of the FCA

Litigation in the Central District of Columbia, and the relationship between issues being litigated

in that case and the claims and defenses raised in this case, strongly favor transferring this case to

that Court.  *See Barham*, 496 F. Supp. 2d at 181 (discussing public interest and judicial economy

concerns supporting transferring case to a court where a related case is pending).  Those

considerations outweigh the Relman Firm's desire to litigate the dispute in its home forum.

Therefore, a case-specific "determination of convenience and fairness" indicates that a

discretionary transfer to the Central District of California is warranted.  *SEC v. Savoy Indust.*,

587 F.2d 1149, 1154 (D.C. Cir. 1978).

## V.    IT IS UNNECESSARY TO REACH MS. LING'S 12(B)(6) ARGUMENTS

Ms. Ling also has moved the Court to dismiss the case pursuant to Rule 12(b)(6), asserting that the Relman Firm has failed to state a claim for anticipatory breach of contract.[5] *See* Ling MTD at 30–31.  Given that the undersigned recommends that the Court transfer this case to the Central District of California, this Report and Recommendation will not reach the merits of Ms. Ling's 12(b)(6) argument.  Instead, the undersigned recommends that the Court decline to reach the 12(b)(6) argument, and deny Ms. Ling's 12(b)(6) motion without prejudice so that Ms. Ling and FHC can present their arguments to the transferee court.  *See, e.g.*, *Harris v. United States Dep't of Veterans Affairs*, 196 F. Supp. 3d 21, 25 (D.D.C. 2016) (declining to reach merits of 12(b)(6) motion given decision to transfer to another court); *Willis v. Chase Home Finance*, 923 F. Supp. 2d 89, 96 (D.D.C. 2013) (same).

## VI.   IT IS UNNECESSARY TO REACH DEFENDANTS' REQUEST FOR A STAY AND ABSTENTION

FHC requests that this Court stay the matter pending the resolution of arbitration.  *See* FHC MTD at 46–47.  The Relman Firm counters that the California law arbitration provisions do not apply to this case.  *See* Opp'n to FHC MTD at 23–36.  Given that the undersigned recommends that the Court transfer this case to the Central District of California, this Report and Recommendation will not reach the merits of the proposed stay.  That is an issue better addressed by the transferee court.

Defendants also ask the Court to abstain from resolving the Relman Firm's claims under the Declaratory Judgment Act.  *See* FHC MTD at 29–32; Ling MTD at 24–26.  It is questionable

---

[5]  Defendant FHC did not raise a 12(b)(6) defense in its pending motion to dismiss, but stated that it may raise such arguments in the future. *See* FHC MTD at 46.

that the abstention doctrine cited by Defendants applies in this context, as it appears to govern courts' ability to abstain from hearing a case when a parallel case involving the same subject matter is pending in state court. *Compare Wilton v. Seven Falls Co.,* 515 U.S. 277, 290 (1995) (declining to delineate federal courts' discretion to abstain from cases presenting federal law or in which there are no parallel *state* proceedings) *with* FHC MTD at 30 (citing *Wilton* abstention doctrine to support its argument that this Court should abstain due to pending related litigation in a separate *federal* court). However, it is unnecessary to reach the issue because transferring this case to the Central District of California would achieve the end that Defendants seek, namely allowing the instant dispute to be litigated in the same forum as the FCA Litigation.

## RECOMMENDATION

Having considered the record and relevant filings, and for the reasons set forth above, the undersigned recommends that the Court, GRANT IN PART, and DENY IN PART the Defendants' Motions to Dismiss, ECF Nos, 10, 22. Specifically, the undersigned recommends that the Court find that: (1) Plaintiff's claims are ripe for judicial review, and this Court has subject matter jurisdiction over the matter; (2) Defendants have sufficient contacts with the District to enable this Court to exercise personal jurisdiction over both parties; (3) venue is proper in this Court; and (4) the balance of public and private interests support transferring this case to the Central District of California. As the undersigned recommends transfer, the undersigned further recommends that the Court decline to reach and deny without prejudice Defendants' request for a stay and Ms. Ling's 12(b)(6) motion, so that those issues may be resolved in the transferee court. Finally, the undersigned recommends that the Court decline to reach Defendants' abstention arguments, as the transfer to the Central District of California essentially moots that request.

## REVIEW BY THE DISTRICT COURT

The parties are hereby advised that under the provisions of Local Rule 72.3(b) of the

United States District Court for the District of Columbia, any party who objects to the Report

and Recommendation must file a written objection thereto with the Clerk of this Court within 14

days of the party's receipt of this Report and Recommendation.  The written objections must

specifically identify the portion of the report and recommendation to which objection is made,

and the basis for such objections.  The parties are further advised that failure to file timely

objections to the findings and recommendations set forth in this report may waive their right of

appeal from an order of the District Court that adopts such findings and recommendation.  *See*

*Thomas v. Arn*, 474 U.S. 140 (1985).


Dated:  August 12, 2019

                                                ROBIN M. MERIWEATHER
                                                UNITED STATES MAGISTRATE JUDGE